FIDELITY & DEPOSIT COMPANY
OF MARYLAND, Plaintiff,

v.

HARTFORD CASUALTY INSURANCE
COMPANY, Defendant.

No. 01–2015–JWL.

United States District Court,
D. Kansas.

Feb. 27, 2002.

matter comes before the court on plaintiff's motion for partial summary judgment (Doc. 36) and defendant's motion for summary judgment (Doc. 38). Plaintiff seeks partial summary judgment with regard to defendant's liability in this matter. Defendant seeks to have the case dismissed. For the reasons, set forth below, plaintiff's motion is granted, and defendant's motion is denied.

## I. Uncontroverted Facts

The following facts are uncontroverted. Plaintiff Fidelity & Deposit Company of Maryland ("F & D") is a Maryland corporation with its principal place of business in Maryland. Hartford is a Connecticut corporation with its principal place of business in Connecticut. National and Midwest Drywall are Kansas corporations with their principal place of business in Kansas. On or around August 28, 1997, National, as the general contractor, entered into an owner/contractor agreement with Prairie View Unified School District # 362 ("School District") to build a school and performing arts center ("the project") for a contract price of $8,144,300. The project contained three sections: areas A, B, and C. The project was scheduled to be completed by May 4, 1999.

F & D, as the surety, bonded the construction of the project, issuing a performance bond with National as the principal and the School District as the obligee. National handled part of the project with its own crew and contracted with various suppliers and subcontractors for other parts of the project. One of the subcontractors was Midwest Drywall. Midwest Drywall obtained a commercial general liability policy, number 37 UUM MY 3553 ("CGL policy"), from Hartford, with a policy period from June 1, 1997 to May 31, 1998 and another policy, number 37 UEM MY 3554, with a policy period from June 1,

J. Nick Badgerow, Spencer, Fane, Britt & Browne, Overland Park, KS, for Plaintiff.

Lee M. Baty, Theresa A. Otto, Randall W. Brown, Baty, Holm & Numrich, PC, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, Chief Judge.

This action flows from defendant Hartford Casualty Insurance Company's ("Hartford") refusal to defend National Contractors, Inc. ("National") and Midwest Drywall, Inc. ("Midwest Drywall") in two underlying lawsuits against them. The

1998 to June 1, 1999. The terms of the two policies were identical. Hartford also issued an umbrella liability coverage policy, number 37 XHU MY 3552 ("umbrella policy"), to Midwest Drywall, with a policy period from June 1, 1997 to June 1, 1999. National, by way of endorsement, was an additional named insured under each of the policies.

On September 16, 1997, the School District notified National to proceed with work, and later that month National began working on the project. On July 20, 1998, the School District notified National that it had become concerned about the quality of National's work. The School District purported to issue a stop-work order on portions of the project the next day; however, it failed to enforce the terms of the order and it continued to pay National for the work performed thereafter. On September 18, 1998, after National and its subcontractors continued to work on the project, the School District again demanded that National stop working, but again continued to pay National for work. At that time, National agreed to cease working in parts of areas B and C but continued to work on other parts of the project until October 21, 1998.

On August 17, 1998, F & D was given notice of a potential bond claim by letter. Then, on October 22, 1998, the School District gave notice to National of its intent to terminate the contract and it made a demand upon F & D pursuant to the terms of the performance bond. The School District's consulting engineers and architects discovered that much of the work performed on the project was defective. Specifically, many of the masonry walls constructed on the project suffered from significant deterioration. Several masonry walls were cracked while blocks within the walls were crushed, cracked and broken. Additional defects identified by the School District included cracked control joints, cracked mortar joints, hacked-in mechanical openings, wet insulation, cracked concrete floor slabs, cracked lintels, a cut and defective roof deck, bent and burnt flashing, incorrectly located lintels and control joints and improperly backfilled storm drain lines.

Pursuant to ¶ 4.2 of the performance bond, F & D proceeded to perform and complete the project through persons other than National. While F & D completed the project, it discovered that much of areas B and C needed to be demolished and rebuilt, and part of area A needed to be repaired. F & D completed the project and the School District now occupies it.

On June 16, 1999, the School District filed suit against National and F & D, among others, in the District Court of Linn County, Kansas. The amended petition alleged breach of contract, breach of an implied warranty, breach of an express warranty, damages for failure to complete the project on time and negligence. In the same lawsuit, F & D cross-claimed against National and Midwest Drywall seeking reimbursement of money expended by F & D, in accordance with the performance bond, to satisfy claims of the School District. F & D also filed suit in federal court against National and Midwest Drywall seeking reimbursement of similar expenses.

At the time it was sued, National requested that Hartford defend the lawsuit and indemnify it for any damages it owed. Hartford declined to do so. On March 15, 2000, National made a similar request to Hartford and again was denied. National and Midwest Drywall have now reached a settlement with F & D regarding both the state and federal court actions in an amount of not less than $4.6 million. As part of the settlement, National and Midwest Drywall assigned any claims they may have against Hartford under the CGL

and umbrella policies to F & D. National is still a defendant in the state court lawsuit involving the School District.

F & D filed the instant cause of action against Hartford seeking damages for Hartford's breach of its duties under the CGL and umbrella policies to defend and indemnify National and Midwest Drywall in the underlying actions against them. Hartford denies that the CGL and umbrella policies cover the claims against National and Midwest Drywall in the underlying actions.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

"Where, as here, the parties file cross motions for summary judgment, we are entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nev-ertheless inappropriate if disputes remain as to material facts." *James Barlow Family Ltd. Partnership v. David M. Munson, Inc.* 132 F.3d 1316, 1319 (10th Cir.1997), *cert. denied,* 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998).

## III. Discussion

F & D argues that Hartford had a duty to defend and indemnify National and Midwest Drywall in the underlying lawsuits because the alleged damages fell within the CGL and umbrella policies' liability coverage.

### A. Interpreting Insurance Contracts–Generally

■ In assessing whether the underlying claims against National and Midwest Drywall fall within the scope of coverage, the court must interpret the language contained in the insurance policies. Under Kansas law [1], the construction and interpretation of an insurance policy is a question of law to be determined by the court. *First Fin. Ins. Co. v. Bugg,* 265 Kan. 690, 962 P.2d 515, 519 (1998). If the relevant facts are undisputed, the court may determine whether they are within the terms of the policy. *Id.* An insurance contract must be construed in a way that gives effect to the parties' intent. *Brumley v. Lee,* 265 Kan. 810, 963 P.2d 1224, 1226 (1998); *Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 840 P.2d 456, 459 (1992). If the language in the insurance policy is unambiguous, the court cannot remake the contract, it must be enforced as made. *Brumley,* 265 Kan. 810, 963 P.2d at 1226 (1998). Unambiguous language is to be "taken in its plain, ordinary, and popular sense." *Bugg,* 962 P.2d at 519. If the

---

1. The court will apply Kansas law in this diversity action because the Hartford policies appear to have been issued in Kansas, *Simms v. Metropolitan Life Ins. Co.,* 9 Kan.App.2d 640, 685 P.2d 321, 324 (1984), and since both parties applied Kansas law in their papers the court finds no reason not to follow suit.

language in the policy is ambiguous, the policy terms are construed in favor of the insured. *Brumley,* 963 P.2d at 1226. In *Brumley,* the Kansas Supreme Court set out its test for ambiguity explaining:

> To be ambiguous, a contract must contain provisions of language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning.

*Id.* (quoting *Catholic Diocese of Dodge City v. Raymer,* 251 Kan. 689, 840 P.2d 456, 459 (1992)).

**B. Provisions of the CGL and Umbrella Policies**

In the coverage section of the CGL policies, Hartford agreed to defend any suit seeking damages "because of 'bodily injury' or 'property damage' to which this insurance applies." The coverage section goes on to explain, the "insurance applies to 'bodily injury' and 'property damage' only if ... [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory....'" In the coverage section of the umbrella policy, it states "we [the insurer]" will pay those sums that the "insured" must legally pay as "damages" in excess of the "underlying insurance," ... because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies caused by an "occurrence."

Hartford argues that coverage does not exist under the CGL and umbrella policies because the deteriorating walls and other damage to the project did not constitute an "occurrence" and cannot be characterized as "property damage," as those terms are defined in the policies.

**1. Occurrence**

■ In both the CGL and umbrella policies, the term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident" is not defined in the policy. "The absence of any definition of the term 'accident' means that an interpretation by law shall apply rather than an interpretation by contractual language." *Brumley,* 963 P.2d at 1224, Syl. 6. "Where the term is not defined in the policy, it must be interpreted in its usual, ordinary, and popular sense." *Id.* The generally accepted meaning of an accident is "an undesigned, sudden, and unexpected event, usually of an afflictive or unfortunate character, and often accompanied by a manifestation of force." *Harris v. Richards,* 254 Kan. 549, 867 P.2d 325, 329 (1994)(citing *Gilliland v. Cement Co.,* 104 Kan. 771, 180 P. 793, 794 (1919)). While the Kansas Supreme Court has not directly addressed the issue of whether structural defects or other damage caused by the insured contractor's negligent workmanship constitutes an "accident," courts that have decided the issue appear to be split. One line of cases has held that faulty or improper construction does not constitute an accident; rather, the damage is the natural and ordinary consequence of the insured's negligent act. *See, e.g., Indiana Ins. Co. v. Hydra Corp.,* 245 Ill.App.3d 926, 185 Ill.Dec. 775, 778, 615 N.E.2d 70, 73 (1993) (holding that cracks on the surface of concrete flooring were not accidental, but instead "the natural and ordinary consequence of installing concrete flooring and applying the wrong type of paint"); *R.N. Thompson & Associates, Inc. v. Monroe Guar. Ins. Co.,* 686 N.E.2d 160, 165 (Ind.Ct.App.1997) (holding that the deterioration of fire-resistant plywood used as roof decking was the natural and ordinary consequence of the insured's use of defective materials, not an accident).

Another line of cases, on the other hand, has held that improper or faulty construction does constitute an accident as long as the resulting damage is an event that occurs without the insured's expectation or foresight. *See, e.g., Federated Mutual Ins. Co. v. Grapevine Excavation Inc.,* 197 F.3d 720, 726 (5th Cir.1999) (holding, under Texas law, that damage to a parking lot caused by negligent construction constituted an accident because it was an "unexpected, unforeseen or undesigned happening or consequence"); *High Country Assoc. v. New Hampshire Ins. Co.,* 139 N.H. 39, 648 A.2d 474, 478 (1994) (holding that rotting walls and loss of structural integrity caused by contractor's faulty workmanship constituted an "accident" because the damages were unintended or unexpected from the standpoint of the insured).

Hartford argues that the structural damage to the project, caused by National and Midwest Drywall's negligent workmanship, does not constitute an "occurrence" under Kansas law because Kansas court's would apply the "natural and probable consequence" test, and because providing coverage for the structural damage would improperly transform the CGL and umbrella policies into a performance bond. F & D, in contrast, contends that Kansas courts have only applied the "natural and probable consequence" test to intentional acts, not negligent ones, and that the structural damage to the project constitutes an occurrence because it was damage that was unintended from the insured's point of view.

In support of its argument that the Kansas Supreme Court would apply the "natural and probable consequence" test to negligent acts, Hartford points the court to *Neale Const. Co. v. United States Fidelity & Guaranty Co.,* 199 F.2d 591, 593 (10th Cir.1952). In *Neale,* wire and cable was installed in a faulty manner causing it to have to be repaired. *Id.* The insured sought to have the insurance company defend it against the telephone company in the underlying lawsuit for expenses incurred to repair the damage but the insurance company refused. *Id.* The Tenth Circuit ultimately held that the damage in the underlying lawsuit was not caused by an accident under the policy because the "natural and ordinary consequences of a negligent act do not constitute an accident." *Id.* at 593. Hartford reasons that similar to *Neale,* here the damage to the project was not caused by an accident because the damage was the natural and ordinary consequence of National and Drywall negligently constructing the project.[2]

**2.** Hartford makes the additional argument that an opinion of this court, *United States Fidelity and Guaranty Co. v. Dealers Leasing, Inc.,* 137 F.Supp.2d 1257 (D.Kan.2001) (Lungstrum, J.), is directly on point with the facts here. The court cannot agree. In *Dealers Leasing,* the insured, after purchasing a minivan from a car dealership, learned that the minivan had been in a previous accident, sold as salvage and reconstructed. *Id.* at 1259. The insured sued the car dealership alleging that the dealership, although not taking part in the reconstruction, should have known about it and that the dealership provided negligent misrepresentations regarding the quality of the minivan. *Id.* Finding for the insurer, this court held that the negligence regarding the inspection of the minivan and the negligent misrepresentations of the car dealership in not informing the insured of the previous damage, did not constitute an "accident." *Id.* at 1262. This court reasoned that negligence itself is not an accident, the accident is the event that results from the negligent behavior. *Id.* To illustrate the point, this court explained that if the minivan had been involved in a wreck, for example, the accident may have occurred as a result of the negligent misrepresentations and negligence of the car dealership. Similarly here, the negligent construction by National and its subcontractors resulted in an accident, the cracking of the walls and other damage to the project.

The court is not persuaded that the Kansas Supreme Court would adopt the reasoning in *Neale*. Although one assumes *Neale* purports to be applying Kansas law, it does not cite to a Kansas case, or any case for that matter, for the proposition that the "natural and probable consequences" test should apply to negligent acts. The opinion appears to be of little value in terms of shedding light on what Kansas law was at the time. In fact, in the 50 years since *Neale* was decided, the Kansas Supreme Court has never applied the "natural and probable consequences" test to circumstances involving negligent acts by the insured. Moreover, in *Spivey v. Safeco Ins. Co.*, 254 Kan. 237, 865 P.2d 182 (1993), the court held that "[w]here the complaint alleges both a negligent and intentional act, these alleged facts give rise to the potential for liability, and the duty to defend arises." *Id.*, 865 P.2d at 188. The court believes that this pronouncement indicates that the Kansas Supreme Court is not inclined to recognize that the natural and probable consequences of a negligent act are presumed intentional.

The court is also not persuaded by Hartford's argument that if the structural damage caused by faulty workmanship constitutes an "occurrence," then the CGL and umbrella policies will be transformed into a performance bond. As one commentator has pointed out, "a performance bond does not 'insure' the contractor[,][i]t runs to the benefit of the third party owner only." S. Turner, *Insurance Coverage Disputes: 2d* § 6:46, at 6–118 (West Aug. 2001). Here, F & D provided a performance bond on the project that ran to the benefit of the School District, not to National or Midwest Drywall. F & D sued National and Midwest Drywall pursuant to an indemnification clause in the performance bond for expenses incurred in finishing the project. The performance bond in no way protected or insured National or Midwest Drywall from liability.

Instead of applying the "natural and probable consequence" test, the court concludes that the Kansas Supreme Court would find that the damage that occurs as a result of faulty or negligent workmanship constitutes an "occurrence" as long as the insured did not intend for the damage to occur. There is support for this position from prior Kansas Supreme Court opinions not related to faulty construction.

For example, interpreting the term "occurrence" in a case arising out of an altercation over repair bills, the Kansas Supreme Court held "[u]nder this policy, coverage is avoided only when an act results in an intentional injury." *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 408 (1973).[3] The court added, "[a]n intentional act may result in an unintended injury." *Id.* This case, where the defendant's employees arguably unintentionally injured the plaintiff while intentionally moving his vehicle, illustrates that under Kansas law, the key to determining whether there is an "occurrence" appears to be whether the resulting damage, not the act performed that led to the damage, was intentionally caused by the insured.

Here, F & D argues that the insured, National and Midwest Drywall, did not intend for the cracked walls and structural damage to the project to occur. F & D supports this conclusion with the declaration of Clay Davis, President of National, which states that National and its subcontractors believed and expected their work

---

**3.** Although the policy in *Spruill* defined the term "occurrence" as "an accident ... which results ... in bodily injury or property damage neither expected nor intended from the standpoint of the insured," the difference in the definition is not significant to the court's analysis.

would meet the contract specifications, and further, that National did not intend for its work on the project to be defective. Although Hartford disputes the use of this declaration, calling it self-serving, Hartford is unable to provide any evidence that National or its subcontractors intended for their work to be defective. Thus, there is no evidence to refute the position that National and its subcontractors did not intend for their work to be defective.

Given the Kansas Supreme Court's prior opinions and the circumstances of this case, the court concludes that the structural defects and other damage to the project, caused by National and Midwest Drywall's negligent workmanship, constitutes an occurrence[4], or, at the very least, that the term "occurrence" is ambiguously defined in the policy[5], thereby requiring the court to construe the term in a manner favorable to the insured. Either way, there was an "occurrence" here.

This outcome is consistent with the Kansas Supreme Court's pronouncement that all relevant provisions of an insurance policy must be read together, rather than in isolation, and given effect. *Brumley*, 963 P.2d at 1227. In this case, the CGL and umbrella policies contain detailed business risk policy exclusions. The business risk exclusions contemplate that some construction defects are covered and some are not. The policy exclusions become meaningless if all construction defects are excluded from coverage because they do not constitute an "occurrence." Because the parties included the business risk exclusions, they could not have intended to exclude all construction defects, whether negligently or intentionally caused.

## 2. Property Damage

■ In addition to being caused by an "occurrence," the injury to the insured must constitute property damage or bodily injury. Both parties agree that there was no bodily injury; thus, the issue is whether there was property damage. In both the CGL and umbrella policies, the term "property damage" is defined as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Hartford does not argue that there was not physical injury to the project, but in-

---

4. In *Green Constr. Co. v. National Union Fire Ins. Co.*, 771 F.Supp. 1000 (W.D.Mo.1991), the court, applying Kansas law, reached a similar conclusion. The court held that the improper settling of a dam, caused by the insured's negligence, constituted an "occurrence" because the damage "was not caused by the reckless or intentional conduct [of the insured]." *Id.* at 1002–03. While the holding was vacated, pursuant to a settlement five years later, in *Green Constr. Co. v. National Union Fire Ins. Co.*, 975 F.Supp. 1365 (W.D.Mo.1996), where the court stated that "the order should not be relied upon for the propositions of law stated therein," this court finds the reasoning of the Judge who wrote the 1991 opinion sufficiently sound that it cannot so blithely disregard the conclusion reached that damage caused by negligent workmanship is an "occurrence." Moreover, the Tenth Circuit has stated that it is "seriously troubled by effort[s] . . . to cause the withdrawal of an opinion . . . and the nullification of its precedential effect" pursuant to a settlement. *Oklahoma Radio Assoc. v. Federal Deposit Ins. Corp.*, 3 F.3d 1436, 1437 (10th Cir. 1993). Of course, here, the *Green Construction* case is persuasive but not binding precedent, in any event.

5. The term "occurrence" could be construed as ambiguous because it is "of doubtful or conflicting meaning." *Brumley*, 963 P.2d at 1232 (holding that coverage existed since the term "occurrence" was ambiguous, in part, because the term accident was not defined).

stead, makes the narrow argument that the physical injury cannot be to tangible property that is the work product of the insured. Hartford cites no case law to support this theory and the court, on its own research, could find none. Because the language of the policies does not support Hartford's reading, the court rejects its argument.

The definition of property damage in the policies does not limit the coverage to property that is not in the possession of or work product of the insured. F & D correctly points out that if the work product of the insured could never come within the definition of property damage, then the exclusions set forth in the policy to limit such damages would be without meaning. The court concludes that the injury to the project allegedly caused by the insured's faulty workmanship was caused by an "occurrence" and resulted in "property damage," thus bringing the circumstances here within the policies' coverage.

### C. Exclusions in the CGL and Umbrella Policies

Finding that the damage to the project was within the coverage of the policies, the court must address the policy exclusions listed in the CGL and umbrella policies.

The CGL policies issued by Hartford contain the following relevant policy exclusions:

**2. Exclusions.**

This insurance does not apply to:

\* \* \* \* \* \*

**j. Damage to Property**

"Property Damage" to:

\* \* \* \* \* \*

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage arises out of those operations";

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

\* \* \* \* \* \*

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

\* \* \* \* \* \*

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The umbrella policy issued by Hartford contains the following relevant exclusions:

**B. Exclusions**

This policy does not apply:

\* \* \* \* \* \*

11. To "property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard."

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

11. To loss of use of tangible property which has not been physically injured or destroyed resulting from:

a. A delay in or lack of performance by you or on your behalf of any contract or agreement; or

b. The failure of "your product" or "your work" to meet the level of performance, quality, fitness or durability warranted or represented by you or on your behalf.

This exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of:

a. "Your property;" or

b. "Your work;" or

After such product or work has been put to its intended use.

13. To "damages" claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

a. "Your product;" or

b. "Your work;" or

c. Any property of which "your product" or "your work" forms a part;

If such product, work or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

In addition to the above exclusions, the umbrella policy includes two endorsements.

**Exclusion—Care, Custody or Control of Personal Property**

This policy does not apply to 'property damage' to personal property:

1. Rented to;

2. Used by; or

3. In the care, custody or control;

Of any 'insured' or as to which any 'insured' is for any purposes exercising physical control.

**Exclusion—Care, Custody or Control of Real Property**

This policy does not apply to 'property damage' to real property:

1. Owned by;

2. Occupied by;

3. Rented to; or

4. In the care, custody or control;

Of any 'insured' or as to which any 'insured' is for any purposes exercising physical control.

Prior to interpreting the policy exclusions, the court must address two arguments made by F & D. First, F & D claims that Hartford waived its right to rely on several, if not all, of the policy exclusions. Second, F & D contends that the court does not need to address the exclusion in the CGL policy because the umbrella policy provides broader coverage.

**1. Waiver of Policy Exclusions**

F & D argues that Hartford waived its right to rely on any policy exclusions because it did not list them in its demand letter or plead them in its answer. Alternatively, F & D argues that if all of the policy exclusions were not waived, only the policy exclusions listed in the pretrial order should be at issue. The court concludes that Hartford did not waive its right to rely on all of the policy exclusions, but it may rely on only those exclusions listed in the pretrial order.

Federal courts applying Kansas law have held that an insurer will not be prevented from asserting additional exclusions in subsequent litigation over the policy's coverage, "simply because it failed to mention each and every potentially applicable exclusion in its" denial letter. *Carpenter, Weir & Myers v. St. Paul Fire and Marine Ins. Co.,* 1998 WL 976309, at *15 (D.Kan. Oct.30, 1998) (citing *Aks v. Southgate Trust Co.,* 844 F.Supp. 650, 660 (D.Kan.1994); *Hennes Erecting Co. v. Nat. Union Fire Ins. Co.,* 813 F.2d 1074, 1078–79 (10th Cir.1987)). Similarly, Hartford's failure to list any policy exclusions in its answer did not waive the exclusions because the exclusions were later included in the pretrial order. There is no indication that F & D objected to Hartford's decision to include the policy exclusions in the pretrial order so F & D cannot now contend that including them was improper. The result is different, however, when it comes to those exclusions that Hartford failed to include in the pretrial order.

In the pretrial order, Hartford argued that coverage is negated by four policy exclusions contained in the CGL policy and two exclusions in the umbrella policy. Specifically, Hartford argued that coverage is precluded by exclusions "j(5)," "j(6)," "l" and "m" in the CGL policy and two exclusions corresponding to "l" and "m" in the umbrella policy. Although Hartford did not explicitly state the policy numbers it was relying on in the umbrella policy, it did indicate that the two exclusions in the umbrella policy were analogous to exclusions "l" and "m" in the CGL policy. Exclusion "l" in the CGL policy and exclusion 11 in the Umbrella policy contain nearly identical language, and while exclusion "m" in the CGL policy is the "impaired property" exclusion and exclusion 12 in the Umbrella policy is the "loss of use" exclusion and, therefore, exclusions "m" and 12 contain different language, the two exclusions apply to similar

risks. Given the similarities between the corresponding policy exclusions, the court concludes that Hartford's reference was sufficient to put F & D on notice that Hartford intended to rely on exclusions 11 and 12 in the umbrella policy. In Hartford's motion for summary judgment, it claimed that coverage was avoided based on all of the exclusions listed in the pretrial order plus three additional policy exclusions in the umbrella policy, exclusion 13 and the "care, custody or control" exclusions, which were not listed in the pretrial order.

According to Rule 16, the pretrial order supercedes the pleadings and establishes the issues to be considered at trial. Fed. R.Civ.P. 16(e); *Tyler v. City of Manhattan,* 118 F.3d 1400, 1403 (10th Cir.1997). "Since the whole purpose of Rule 16 is to clarify the real nature of the dispute at issue, attorneys at a pre-trial conference must make a full and fair disclosure of their views as to what the real issues of the trial will be." *Rios v. Bigler,* 67 F.3d 1543, 1549 (10th Cir.1995) (internal quotations omitted). "The district court has discretion to exclude from trial issues and claims not set forth in the pretrial order, and to refuse to instruct the jury on matters beyond the scope of the pretrial order." *Id.* (internal citations omitted). Accordingly, this court concludes that Hartford is precluded from relying on the "care, custody and control" exclusions and exclusion 13 by not raising the exclusions in the pretrial order. *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1217 (10th Cir. 2000). It is important to note that Hartford never moved to amend the pretrial order to add the additional policy exclusions as defenses or otherwise took any other action before filing its motion to alert the court or its adversary that it intended to rely on any claims or defenses not listed in the pretrial order. There is nothing sacrosanct about affirmative de-

fenses derived from insurance policy exclusions. They can be waived if not raised in time to be included in the final pretrial order, and that is the result here.

## 2. Umbrella Policy Drops Down to Fill Gaps

■ Next, F & D argues that the court does not need to address exclusions in the CGL policies because even if those exclusions would negate coverage under the CGL policies, the umbrella policy is broader and would drop down to provide primary insurance coverage. Hartford disputes this claim, arguing that the umbrella policy was intended to provide coverage only in excess of the CGL policies.[6]

The umbrella policy insuring agreement states: "We will pay those sums that the 'insured' must legally pay as 'damages' in excess of the 'underlying insurance,' or of the 'self-insured retention' when no 'underlying insurance' applies, because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies caused by an 'occurrence.' " Consistent with F & D's position, the umbrella policy's language, "[w]e will pay those sums ... in excess of the ... 'self-insured retention' when no 'underlying insurance' applies," clearly contemplates a situation where the umbrella policy would provide primary coverage because the underlying insurance did not apply.

This interpretation is consistent with the definition of an umbrella policy. The Tenth Circuit has explained that an umbrella policy generally provides two types of coverage: excess coverage and, when broader than the underlying policy, primary coverage. *Coleman Co. v. California Union Ins. Co.*, 960 F.2d 1529, 1530 n. 1 (10th Cir.1992). An umbrella policy provides standard excess insurance coverage that applies after a predetermined amount of primary coverage is exhausted. *Id.* Additionally, an umbrella policy can provide broader coverage than the underlying policy, meaning that the umbrella policy will "drop down" to provide primary coverage. *Id.* Put another way, "[a]n umbrella policy has been characterized as a 'hybrid policy, combining aspects of both a primary policy and a following form excess policy.' " *Id.* (citing Michael M. Marick, *Excess Insurance: An Overview of General Principles and Current Issues*, 24 Tort & Ins. L.J. 715, 717–19 (1989)). When either the limits of the underlying policy have been exhausted or the umbrella policy drops down, the insurer will typically have a duty to defend. *Id.*

Here, the umbrella policy is broader than the CGL policy because it does not contain exclusions similar to the "j(5)" and "j(6)" exclusions. Consequently, even if those exclusions apply and the CGL policy does not provide coverage, the umbrella policy will drop down to provide primary coverage.

---

**6.** Hartford's argument rests on the mistaken premise that the policy is a standard excess insurance policy. Hartford is correct that if this policy were an excess policy, it would only apply after the primary insurance is exhausted. *Associated Wholesale Grocers Inc. v. Americold Corp.*, 261 Kan. 806, 934 P.2d 65 (1997). The policy is not, however, an excess policy. This is evidenced by the fact that one of the endorsements contained in the umbrella policy regarding coverage for "employee benefits" liability, "Form XL 04 15 88," pro-

vides that "the insurance afforded herein [for employee benefits liability] shall follow all the terms, definitions and exclusions of the 'controlling underlying insurance policy....' " If Hartford had intended for the policy to be a standard excess policy, it would have structured the entire policy in a fashion similar to the endorsement.

**7.** A "following form" excess policy covers the same risk that is covered by the underlying policy. *Coleman, Co.*, 960 F.2d at 1530 n. 1.

### 3. Interpreting the CGL and Umbrella Exclusions

Hartford argues in its motion for summary judgment that coverage is precluded under the policy by exclusions "j(5)," "j(6)," "l" and "m" contained in the CGL policies and exclusions 11, 12 and 13 and the "care, custody and control" exclusions contained in the umbrella policy. As explained in detail above, because Hartford did not include exclusion 13 and the "care custody and control" exclusions in the pretrial order and because the umbrella policy will drop down to provide broader coverage than the CGL policy, the court needs to address only exclusions 11 and 12 contained in the umbrella policy.

■ With regard to policy exclusions generally, even if coverage is established under an insurance policy, an insurer may still be excused from its duty to defend if, as a matter of law, policy exclusions apply to preclude coverage. The insurer has the burden of establishing that the policy exclusions apply to the circumstances of the particular case. *Marquis v. State Farm Fire and Casualty Co.*, 265 Kan. 317, 961 P.2d 1213, 1220 (1998) (citing *Upland Mutual Insurance, Inc. v. Noel*, 214 Kan. 145, 519 P.2d 737, 742 (1974)). Policy exclusions generally require a "narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in clear and explicit terms." *Id.* (citing *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 840 P.2d 456, 460 (1992)). When an insurer intends to restrict coverage, "it must use clear and unambiguous language in doing so, otherwise the insurance policy will be construed in favor of the insured." *Id.* (citing *Farm Bureau Mut. Ins. Co. v. Old Hickory Casualty Ins. Co.*, 248 Kan. 657, 810 P.2d 283, 286 (1991)).

### a. Exclusion 11 Does Not Apply To These Facts

Exclusion 11 precludes coverage to "property damage" to "your work" if the damage is caused by your work and if the work is included in the "products-completed operations hazard." The "products-completed operations hazard" includes "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arises out of 'your product' or 'your work' except ... [p]roducts that are still in your physical possession; or ... [w]ork that has not yet been completed or abandoned." Here, the uncontroverted facts establish that National had not completed the project at the time that the School District gave notice of its intent to terminate the contract. Thus, this exclusion does not apply to negate coverage.

### b. Exclusion 12 Does Not Apply To These Facts

■ Exclusion 12, the "loss of use" exclusion, applies to preclude coverage for claims arising out of the loss of use of tangible property, that has not been physically injured, stemming from either the insured's delayed or failed performance of a contract, or an insured's faulty workmanship on that contract. *See, e.g., Hayden v. Mutual of Enumclaw Ins. Co.*, 141 Wash.2d 55, 1 P.3d 1167, 1172 (2000). This exclusion does not apply if the "loss of use" of other property results from the sudden and accidental physical injury to the insured's work after it has been put to its intended use.

Under the circumstances here, the court concludes that exclusion 12 does not unambiguously preclude coverage because the requirements of this exclusion are not met. Although the uncontroverted facts establish that the underlying lawsuit is, in part, a "loss of use" claim, the School District's property, including the school and per-

forming arts center, was physically injured. Among other injury, masonry walls were cracked, and blocks within the walls were cracked, crushed and broken. While the Kansas Supreme Court has not defined physical injury, the court concludes that it would find, as have other courts, that the facts here fall within the definition. *See, e.g., Missouri Terrazzo Co. v. Iowa Nat'l Mutual Ins. Co.*, 740 F.2d 647, 651–652 (8th Cir.1984) (holding that cracking in a terrazzo floor constituted physical injury, thus making the "loss of use" exclusion inapplicable).

This interpretation is consistent with the purpose of this exclusion. The exclusion is aimed at precluding coverage for failure of a product to perform as warranted, as opposed to the physical breakdown of the insured's product. *Hayden*, 1 P.3d at 1172. Here, it was the physical breakdown of the work performed by the insured that caused any loss of use and not a mere failure of the work to perform as well as warranted. The court concludes that this exclusion does not preclude coverage under the circumstances present here.[8]

**D. Duty to Defend**

Under Kansas law, an insurer has a duty to both indemnify and defend the insured. The assessment of whether the insurer has a duty to defend ultimately rests upon whether there is coverage under the insurance policy. *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 732 P.2d 741, 744 (1987) (citing *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 406 (1973)).

When making the determination, the insurer must take into account the allegations in the complaint, any facts it has been made aware of and any facts it could have reasonably discovered. *Id.* "The duty to defend arises whenever there is a 'potential of liability' under the policy." *MGM, Inc. v. Liberty Mutual Ins. Co.*, 253 Kan. 198, 855 P.2d 77, 79 (1993). Thus, the insurer may have a duty to defend its insured even though in the end it may not have an obligation to indemnify the insured. *Id.* However, an insured is not required to defend an action that is brought "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured." *Spruill Motors*, 512 P.2d at 406.

The analysis regarding the duty to defend is different than the analysis regarding the duty to indemnify because here the insurer has waived its right to rely on several policy exclusions. While this precludes their application regarding indemnification, the determination of whether there was a duty to defend arose at the time National notified Hartford of the underlying lawsuits against it and requested that Hartford defend it. Therefore, the court must look at the policy and all of its exclusions and determine whether Hartford was justified in concluding that there was no possibility that coverage existed under the CGL and umbrella policies. The court concludes that coverage was a possibility and Hartford should have de-

---

**8.** Although the language contained in exclusion "m" is different from the language in this exclusion, the court need not address that exclusion because it does not apply to these facts. Similar to exclusion 12, it does not apply if there is physical injury to the property at issue. Moreover, under exclusion "m," "impaired property" means tangible property other than "your work." "Your work" is defined as "work or operations performed by you or on your behalf." Thus, the project would not constitute impaired property because it was the insured's work. Exclusion "m" applies in a situation where, for example, the insured's work is incorporated into other property and that other property is not able to be used because of a defect in the insured's work. That is not the case here.

fended National and Midwest Drywall in the underlying actions against them.

As the court explained above, here there was an "occurrence" that gave rise to "property damage," as those terms are defined in the policies. Thus, Hartford's only avenue for establishing that coverage was wholly outside the policy is to show that the policy exclusions contained in the CGL and umbrella policies were clearly intended to exclude coverage for circumstances like those that occurred here. While it is clear that exclusions "j" through "n" in the CGL policy are "business risk" or "work product" exclusions aimed at excluding coverage for defects caused by faulty workmanship, *see generally* Gregory G. Schultz, 33 Tort & Ins. L.J. 257, 257 (Fall 1997), not all of these exclusions are present in the umbrella policy.

Consequently, Hartford should have anticipated that there was a possibility that the umbrella policy would "drop down" to provide primary coverage. While the denial letter that Hartford sent National confirming that it would not defend the action contained a detailed explanation of why the CGL policy did not apply, the letter fails to address the umbrella policy. Moreover, although a subsequent denial letter dated August 4, 2000 explained in more detail that coverage would be denied because the circumstances did not constitute an "occurrence," for the reasons explained above, the court disagrees with Hartford's reasoning. In addition, Hartford should have been aware that Kansas case law is far from clear in its interpretation of the term "occurrence" and, given the uncertainty in the law, Hartford should have known that there was a possibility that coverage existed under the policy.

In sum, the court finds, as a matter of law, that Hartford had a duty to defend National and Midwest Drywall in the underlying lawsuit. The court further finds, as a matter of law, that Hartford has a duty to indemnify National and Midwest Drywall for the expenses incurred in the underlying lawsuits against them.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's motion for partial summary judgment (Doc. 36) is granted and defendant's motion for summary judgment (Doc. 38) is denied.

**IT IS FURTHER ORDERED BY THE COURT** that the trial of the remaining issues in this case shall begin at 10:30 a.m. on Tuesday, April 16, 2002. A limine conference is hereby scheduled for Monday, April 15, 2002 at 3:30 p.m.