**DODSON INTERNATIONAL PARTS, INC., Plaintiff,**

v.

**Phillip ALTENDORF, Jeffrey Altendorf, Circle H L.L.C., Resources Unlimited, Inc., Richard Moorhead, Mansfield Heliflight, Inc., and Eric Chase, Defendants.**

No. 00–4134–SAC.

United States District Court,
D. Kansas.

Nov. 3, 2004.

---

See also 181 F.Supp.2d 1248.

Donald G. Scott, R. Pete Smith, McDowell, Rice, Smith & Gaar, Kansas City, MO, J. Roger Hendrix, Mark L. Bennett, Jr., Penny R. Moylan, Bennett, Hendrix & Moylan, L.L.P., Topeka, KS, for Plaintiff.

Mark S. Gunnison, Robin E. Scully, II, Payne & Jones, Chtd., Overland Park, KS, Kevin James Grauberger, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Arthur E. Palmer, Goodell, Stratton, Edmonds &

Palmer, Topeka, KS, Gary L. Franklin, Miller, Eggleston & Cramer, Ltd., Burlington, VT, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

As reflected in the pretrial order, this is a commercial case in which the plaintiff Dodson International Parts, Inc. ("Dodson International") asserts state law claims of conspiracy, unfair competition and misappropriation of trade secrets and alleges that Phillip Altendorf and Jeffrey Altendorf while working for the plaintiff conspired with Mansfield Heliflight, Inc., Eric Chase, Richard Moorhead, and Resources Unlimited, Inc. to divert several lucrative business opportunities from the plaintiff. Prior to the Dodson International's Chapter 11 bankruptcy filed in the summer of 2002, it had settled with the Altendorfs, Richard Moorhead and Resources Unlimited, Inc. The remaining defendants, Mansfield Heliflight, Inc., ("Mansfield") and Eric Chase, had filed a motion for summary judgment (Dk.107) which had become ripe for decision, and the plaintiff had filed a motion to amend the pretrial order (Dk.110). With the termination of the automatic bankruptcy stay and notice from Dodson International's counsel of the same, (Dk.133), the court now decides the pending dispositive motion and the motion to amend the pretrial order.

## SUMMARY JUDGMENT STANDARDS

A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir.1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987). If this burden is met, the nonmovant must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the

nonmovant." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). (citations omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995). Rather, the opposing party must come forward with significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256, 106 S.Ct. 2505. To be sufficient, the evidence must be "in specific, factual form for a jury to return a verdict in that party's favor." *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quotation omitted). The rules of this court further specifically state that "all material facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." D.Kan. Rule 56.1(a).

## STATEMENT OF FACTS

In the 1960's, Bob Dodson started an aviation business, and his son, J.R. Dodson, began working full-time in the parts division of his father's business in 1980's. Growth in parts business led to the formation of Dodson International Parts, Inc., and J.R. Dodson became its president. Dodson International Parts is engaged in the business of aircraft recovery, which includes the bidding on and purchasing damaged and downed aircraft, the repair and restoration of damaged aircraft, the sale of restored or repaired aircraft, and the sale of salvaged aircraft parts. There are several other affiliated corporations and companies owned and operated by Bob and J.R. Dodson, including: Dodson Aeroservice, Inc.; Dodson Investment Holding Company; Dodson Aviation, Inc.; Dodson Rotorwing Division; and Dodson International Parts, Inc., Helicopter Division.

In the latter half of the 1980's, Bob Dodson married Pam Altendorf, who was the mother of Philip Altendorf and Jeffrey Altendorf. Prior to June of 2000, Bob Dodson referred to Philip and Jeffrey as his sons, and J.R. Dodson referred to the Altendorfs as his brothers. Phillip Altendorf began working for Dodson International Parts in 1988 and sometime in the early to middle 1990's focused his efforts on helicopters. Jeffrey Altendorf also began working for Dodson International Parts.

The plaintiff alleges the Altendorfs were never officers or shareholders in Dodson International Parts and exploited their family position and relationship by misappropriating business opportunities and transactions for their own benefit. The plaintiff further claims that other named defendants combined and conspired with the Altendorfs to engage in this misappropriation of the plaintiff's business opportunities. Under general theories of civil conspiracy, misappropriation of trade secrets and unfair competition, the plaintiff alleges that the Altendorfs while in the plaintiff's employ engaged in a series of transactions that diverted business opportunities from Dodson International to Eric Chase and Mansfield Heliflight, Inc., a corporation that prominently deals in helicopters and helicopter parts, and Richard Moorhead and Resources Unlimited, Inc. These other parties directly compete with the plaintiff for business. The remaining paragraphs under this section address the individual transactions at issue in this lawsuit.

### AS 355

According to the plaintiff, Phillip Altendorf traveled to Sweden at Dodson's ex-

pense, inspected the AS 355 helicopter, and submitted a bid on Dodson's behalf which the owner of the helicopter accepted in November of 1999. According to Phillip Altendorf, J.R. Dodson told him to wait on this deal because of cash flow issues, and Phillip came to the conclusion that Dodson International would not be able to complete the deal. Phillip Altendorf then approached Moorhead and Resources Unlimited and revealed this deal which Dodson was unable to complete. Altendorf told the owner of the AS355 that Moorhead was interested. Altendorf and Moorhead discussed their joint involvement on this project through Altendorf's business, Circle H. Moorhead and Altendorf agreed to split any profits received after Moorhead recovered his initial investment. In December of 1999, the helicopter was delivered to Resources Unlimited in Texas, and the engines were later transported to Dallas Airmotive. Altendorf used a truck and an employee from Dodson International to transport the engines.

To purchase the AS355, Moorhead and Resources Unlimited had taken out a high interest, short-term loan in November of 1999. When this loan became delinquent, Phillip Altendorf helped them look for alternative financing. Altendorf approached Eric Chase and Mansfield with this deal. In May of 2000, Mansfield purchased the AS 355 from Resources Unlimited and agreed to share profits with Altendorf and Resources Unlimited after all initial expenses had been paid. The engines are still located at Dallas Airmotive, and are the subject of an interpleader action filed by Dallas Airmotive in which the plaintiff disputes the title to those engines. The action is entitled Dallas Airmotive, Inc. v. Dodson International Parts, Inc., Mansfield Heliflight, Inc. and is pending in the District Court, Dallas County, Texas, Case No. 00–8220–J. The action has been abated pending the outcome of the instant case.

## PUMA 330J

In Spring of 2000, Richard Moorhead of Resource Unlimited informed Eric Chase of Mansfield about this aircraft's availability and about Phillip Altendorf's efforts to put a deal together. Chase traveled to Malaysia and inspected the aircraft. Chase signed a contract for Mansfield and put down a deposit for its purchase. Mansfield also arranged for the profitable sale of this aircraft to another purchaser. Mansfield, however, never completed its purchase of the aircraft, because it lost the financing on the deal. In its reply brief, Mansfield attaches an excerpt from J.R. Dodson's deposition in which J.R. admits that Mansfield did not follow through with this deal, although Altendorf and Chase had traveled to Malaysia together on this deal and had a contract drawn up.

J.R. Dodson also testified that the availability of the PUMA 330J was communicated to Phillip Altendorf, an authorized agent of Dodson International. When asked if there was something wrong with Altendorf sharing this information with Mansfield for purposes of making a cooperative bid, J.R. Dodson answered:

If it was okayed in the proper manner, then there would not have been. Neither of those were done. It was without the scope of Phillip's authority. And haven't even addressed the fact that why would Dodson, in effect, if you have Joe's Computer Shop, why would Microsoft come to you and say, you know, Joe, I need to involve you to do this deal, but I want you to pay me at this LLC that I've formed, but its okay, Bill Gates knows about it.

(J.R. Dodson Depo., Aug. 15, 2001, pp. 171–72; Attach. 12 to Dk. 116). J.R. Dodson further testified that while he would

have been interested at the time in pursuing this business opportunity, he did not later contact the seller of the aircraft about purchasing it or the terms of any such deal.

### BELL 212s

In late 1999 and the first part of 2000, Mansfield and Phillip Altendorf, acting as a broker, sought to purchase these aircraft from SAEMSA in Mexico. In offers faxed to SAESMA from Phillip Altendorf of Dodson International, it was represented that the offers were being made by Mansfield in cooperation with Dodson. Eventually, a price was agreed upon and money was put in escrow, but the deal was never consummated because SAESMA failed to produce certain documentation on the aircraft.

J.R. Dodson testified in his deposition that he would not have purchased the aircraft at the agreed price reached in the unconsummated deal but that the information of this opportunity was withheld from him thus preventing the plaintiff from negotiating a more favorable purchase price. When asked about the subsequent availability of the aircraft, J.R. Dodson testified:

Q. Okay. Okay. Anything else on the this these Mexican 212's, or do you know what's happened with them, or—

A. My understanding is that they are still setting there as of—I think the last time I even anything on them was like six months ago.

Q. Okay. And if they were just sitting there as of six months ago, why not buy them?

A. I wasn't agreeable to buying that transaction. It was anything that we wanted to proceed with, at that time, at least.

Q. Okay. And—

A. At that number.

Q. Well, then how did anybody else prevent you from closing a deal on those 212's?

A. On that particular transaction, I would say that no one did.

Q. So then how were you damage by anything that Mansfield or Eric Chase did, if you could have bought it for the same terms that they had talked about?

A. I would say there's some damage down there since the last three phone calls that I made to Jani Galicia, who is the lady who the offers were referred to, were unreturned, and that she didn't come by at the Heli Expo when she was there, even though we went into a mutual acquaintance, and that that was a contact that was previously mine. I had started the relationship with Samsa, and was a very contact with ongoing relations up until the point of this Bell 212 offer.

(J.R. Dodson Depo., Aug. 15, 2001, pp. 226–27; Attach. 13 to Dk. 116). J.R. subsequently testified that it would be difficult to quantify the damages resulting from the harm done to the relationship between Dodson International and SAESMA.

### BELL 206L

In 1999, Eric Chase of Mansfield learned of the availability of this aircraft through information published to the public by National Air Salvage, and he tracked down the owner of the aircraft through the posted serial numbers. In January of 2000, Chase contacted Phillip Altendorf with this information and requested his help in checking out the aircraft and purchasing it. Altendorf told Chase that he was aware of this aircraft but that Dodson International had not purchased it. In March of 2000, Phillip Altendorf on behalf of Dodson International placed a bid of $100,000 on this aircraft. Two months later in May of 2000, Phillip Altendorf on

behalf of Mansfield placed a bid of $152,000 which the seller accepted. Mansfield later sold the aircraft to a third party for a profit. Neither Phillip Altendorf nor Dodson International shared in any of those profits.

J.R. Dodson testified in his deposition that this aircraft would have been a rebuild project for Dodson International requiring additional time and money to put the aircraft into operable condition. He conceded that he didn't have sufficient information from which to conclude whether they would have purchased the helicopter at the price paid by Mansfield.

### BELL 230

On May 24, 2000, Dodson employee Zach Klammett, acting on Phillip Altendorf's directions, offered $500,000 for the purchase of this aircraft. Neither Altendorf nor Klammett had received authorization from J.R. Dodson or others to make this offer. The seller responded the next day that the asking price was $750,000. Approximately five days later, the seller wrote Mr. Klammett asking if Dodson's offer was still open, and if so, the seller would begin the paperwork. Several days later, Mr. Klammet replied asking for certain information so that Dodson International could prepare a purchase agreement. On June 14, 2000, Mr. Klammet communicated with the seller thanking him for the information and advising that Phillip Altendorf would be contacting him the next morning "to finalize the deal." On June 26, 2000, the seller sent to Phillip Altendorf the specific owner's name that should appear on the purchase agreement. Phillip Altendorf understood that the seller had accepted the $500,000 offer he had made on Dodson's behalf but that Altendorf had not brought this deal to J.R. Dodson or anyone else for final approval. Consequently, Altendorf did not consum-

mate this deal on behalf of Dodson. On June 30, Dodson International terminated the employment of Phillip Altendorf and his brother, Jeff. Dodson International later hired an agent to offer $500,000 for the aircraft, but the agent submitted a written bid for less which the seller did not accept.

Eric Chase testified that in the Spring of 2000, Phillip Altendorf contacted him about this aircraft asking if Mansfield would be interested in acquiring it for $750,000. Chase told Altendorf that it was worth only $500,000. Sometime later in May or June, Altendorf reported back to Chase that the aircraft could be acquired for $500,000. Hearing this news, Chase offered the seller this amount. According to Phillip Altendorf, he had contacted Chase in an effort to purchase the aircraft directly for Dodson International with a turnaround sale to Mansfield for a Dodson profit. After his employment with Dodson International ended, Altendorf traveled to Venezuela on behalf of Mansfield, inspected the aircraft, and signed a purchase contract on behalf of Mansfield on July 10, 2000.

### BELL 407

In the Spring of 2000, Phillip Altendorf informed Eric Chase about the availability of this aircraft. Altendorf also told the seller's agent, Ian Foord, that Dodson International was not interested in buying it but that the agent should contact Mansfield, a customer to whom Dodson would have sold this aircraft if Dodson had taken the deal. Altendorf told Chase that Dodson International's representatives in Mexico had said it would take $200,000 to buy the aircraft, that Altendorf did not believe the aircraft was worth this amount, and that Chase could buy it for around $100,000. According to Altendorf, Dodson could not submit a bid lower than what his representatives recommended, because

they would be upset with Dodson for going around them and would stop supplying Dodson with information and help. Consequently, Altendorf passed the deal onto Chase and Mansfield. According to the seller's agent Foord, four bids were received, one of which purportedly came from a Dodson representative, but Mansfield submitted the highest bid of $95,000. There is a factual dispute over whether Dodson actually submitted a bid for this aircraft. Altendorfs later arranged for the sale of the engines from this aircraft, and the $120,000 profit from the sale of the engines was split with Altendorfs and the Altendorf's company, Circle H.

J.R. Dodson testified that the Dodson International would have bid $100,000 for this aircraft if Altendorf had told him of this offering. The plaintiff also submits a letter from Dodson's representative in Mexico denying that he submitted any bid on behalf of Dodson for this aircraft.

## PHILLIP ALTENDORF'S APPARENT AUTHORITY

In the early to middle 1990's, Phillip focused his efforts on helicopters leading to the designation of a Helicopter Division with Dodson International. Bob Dodson discussed and consented to the formation of this division and to Phillip having the title of President of the Helicopter Division and to Jeff having the title of Vice President of the Helicopter Division. Bob Dodson said these titles did not have any real meaning within the corporation, as neither Altendorf held any corporate office. Bob Dodson also recognized that these titles conveyed prestige to his stepsons and gave value to their work. Bob Dodson further testified that the aviation salvage business is small and that everyone knew the Altendorfs were his stepsons. When asked if he told anyone about the Altendorfs' limited authority to bind Dodson International,

Bob Dodson answered that he did when someone directly asked him. Bob Dodson also explained that he would have given the helicopter division to his stepsons:

A. They—I know this is bad, but yes, Phil and Jeff at any time could have had the business.

Q. Had you communicated that to them at some point that some day, some day this will be yours, in so many words?

A. They—they didn't want to wait, so-to get the business, but if they would have just come to me, they could have the helicopter business. It didn't mean that much to us. They didn't need to steal, they didn't need to do all this stuff. I would have gave them the business. So—

Q. So—

A. To ask me that question, yes. You have no goddamn idea what this has done to my family and they didn't need to do this. They had everything.

(Dk. 109, Ex. 6, Bob Dodson Dep. p. 77).

J.R. Dodson denies approving the Altendorfs' use of titles but admits he knew the Altendorfs were using the titles. He further knew that the Helicopter Division had its own letterhead and fax cover sheets and that it put out advertisements using the name of this division. Eventually, the Altendorfs had their own offices, secretary, stationery and business cards.

Corporate counsel for Dodson International, Wendell Barker, was asked whether he agreed that Bob and J.R. Dodson had "placed Phil and Jeff Altendorf in a position where they could hold themselves out as saying they had the authority to deal with people as the helicopter division instead of Dodson International." (Dk. 109, Ex. 5, Barker Dep. p. 81). In pertinent part, Barker answered:

A. I certainly think that there was definitely a degree of apparent authority there. I-you know, the, the real, although internal limitations on them spending money would obviously, you know, restrain them from getting too wild where you're dealing with a five or $10,000 limit. And, yeah, frankly, frankly it's the apparent authority end of it that's been of great concern to us where our name was being used as a party who was supposedly conducting some of these transactions, . . ., but you take several of those deals around the world and people with shaky financing throwing your name around, the apparent authority you're talking about and the fact that our name was being used were really quite worrisome.

*Id.* at pp. 81–83.

Eric Chase of Mansfield testified that he had some prior dealings with Dodson International having called looking for parts. Most of his contacts had been with Phillip Altendorf. Chase did not meet Phillip Altendorf until December of 1999. After receiving a call from Altendorf about some Bell 212s available in Mexico, Chase and Altendorf met in Mexico to inspect the aircraft. When they met, Altendorf represented himself to be the president of the Helicopter Division of Dodson International and expressed his desire to be involved in this deal. Altendorf did not limit or specify the particular capacity of his involvement. At least by the Spring of 2000 during the Bell 407 deal, Chase understood that Phil Altendorf owned or was involved with a company called Circle H which was engaged in the aviation salvage business and through which this deal would be handled. During a line of questions regarding his knowledge of Altendorf's capacity and authority for engaging in such deals, Chase testified as follows:

Q. When you were dealing with Phil on this engine, did you have any discussions with him about the propriety of him being involved in something like this where he's going to take a cut of any profits when he was employed by another company?

A. No. Why would I?

Q. Well, I'm just asking you if you did. That didn't cause you any—to question anything?

A. No. There's—there's—I mean Dodson itself has several different divisions. Circle H, I have no idea what the structure is of it. He's the president of the company, represented himself as having the authority to run the deals and do what he wanted to do, so I never question what-what his position was.

(Dk. 109, Ex. 3, Chase Dep. p. 54). Chase testified about wiring commissions earned by Phillip Altendorf to Circle H, but he later reiterated that he had "no idea to— how Dodson Aviation, Circle H, Phil Altendorf, what their relation is and how the business disbursements of funds would be." (Dk.116, Attach.Ex.34, p. 68). When asked about Bell 230 deal and his understanding of Altendorf's capacity in calling Chase with this information, Chase answered:

Q. Now, at that time did Mr. Altendorf indicate to you that that was a helicopter being offered by Dodson, or what did he tell you?

A. He didn't tell me. That stuff's assumed. I mean every day I get calls from people all over the world that offer equipment to me, and I assume that if Phil Altendorf's calling me, that he's representing Dodson International, and he's offering me an aircraft and/or some part of an aircraft and has an interest in being involved in it.

*Id.* at p. 105. Chase denies ever being advised or informed about Dodson Inter-

national's restrictions on the authority given Phillip Altendorf or Jeff Altendorf.

J.R. Dodson offers a different picture of Phillip Altendorf's authority and what Chase may have known. Phillip Altendorf could set sales prices and make purchases for helicopters and/or helicopter parts up to $10,000, and all larger sales or purchases had to be discussed with and approved by J.R. Dodson. J.R. Dodson admitted that these limits on Phillip Altendorf's authority were not publicly announced outside of the company. He further testified, however, that he had told some customers about these limits and that from transactions he attended or witnessed, others with whom Dodson International did business would have understood these limits based on Altendorfs' comments about needing the approval or the signature of others to complete deals above certain amounts. As for Eric Chase having knowledge of these limits, J.R. Dodson testified that Chase had purchased some parts from Dodson International and that during those negotiations he had overheard Jeff Altendorf tell Chase of needing J.R. Dodson's approval. The plaintiff questions the reasonableness and credibility of Chase's statement that he believed he was dealing with the Altendorfs in their capacity as officers of the Helicopter Division when he engaged in the transactions that are the subject of claims in this case. The plaintiff points principally to the facts that Mansfield was a competitor of Dodson International, that the transactions financially benefited Mansfield and not Dodson, and that the commissions from these deals were paid to the Altendorfs and their company, Circle H, and not to Dodson International.

Ian Foord, the seller's representative in the Bell 407 transaction, testified that he understood Phillip Altendorf to be the person in charge of the helicopter division of Dodson International with the final authority to submit bids and negotiate deals. Mr. Foord's boss, Mr. McKeeman, also had the same impression of Phillip Altendorf's authority and was unaware of any restrictions on this authority. At the same time, Foord said that for Altendorf on behalf of Dodson International to be partnering with Mansfield on this deal "wouldn't have made much sense considering the size of Dodsons." (Dk. 116, Attachs. Ex. 35, Ian Foord Dep. p. 73). Foord also said it "would sound strange" for Altendorf to be managing the project for Mansfield. *Id.* at p. 74.

## TRADE SECRETS

Dodson International did not have any written agreements with Phillip or Jeffrey Altendorf concerning their employment or the subjects of confidentiality, loyalty, competition, self-dealing, or other opportunities within the corporation. Nor did Dodson International have any written policies with regard to the disclosure of trade secrets or employment manuals or handbooks of any kind during the relevant time period.

In response to the defendants' challenge that it has not identified any specific information qualifying as trade secrets, the plaintiff cites the following testimony. General counsel for Dodson International, Wendell Barker, testified that a file cabinet containing all pending and completed deals on helicopters was marked confidential on its outside. When asked about proprietary information, Bob Dodson testified that Dodson International had proprietary information in its computer database that showed a history of which components sell and which don't.

Dodson International does not have exclusive arrangements or written or oral contracts with insurance companies or

fixed base operators for information of aircraft that becomes available for bidding or for first rights of refusal on aircraft available for purchase. J.R. Dodson, however, described Dodson International as one of the largest aviation salvage companies with "relationships that at certain times when it was an insured's best interest to move quickly and/or dispose of something, you know, in a professional manner, that in essence, it lended itself to an exclusive relationship." (Dk. 109, Ex. 7, J.R. Dep. at p. 95).

## APPARENT AGENCY

The defendants argue that with respect to all of the deals in question Dodson International bestowed Phillip Altendorf with apparent authority to negotiate, structure, participate and execute them, and that the defendants believed Phillip had the authority to engage in the same on behalf of Dodson International. The defendants point to Dodson International being a family business with multiple affiliated businesses, to Phillip Altendorf being a stepson of Bob Dodson and using the authorized title as president of the helicopter division, and to the third parties relying on these representations about Phillip Altendorf. The helicopter division had its own letterhead, and its officers had their own business cards and telephone and fax lines. The defendants say their course of dealing with Dodson International did not reveal that Phillip Altendorf's authority was restricted or that he was acting in any capacity other than as the president of the helicopter division. The defendants assert it is uncontroverted that any restrictions on Phillip Altendorf's authority were never communicated to the public or to Mansfield.

■ "[A]cts and contracts of the agent as are within the apparent scope of the authority conferred on him, although no actual authority to do such acts or to make such contracts has been conferred, are also binding upon the principal." *Bucher & Willis Consulting Engineers, Planners and Architects v. Smith,* 7 Kan. App.2d 467, 469, 643 P.2d 1156 (1982). "An ostensible or apparent agency may exist if a principal has intentionally or by want of ordinary care induced and permitted third persons to believe a person is his or her agent even though no authority, either express or implied, has been actually conferred upon the agent." *Mohr v. State Bank of Stanley,* 241 Kan. 42, 45, 734 P.2d 1071 (1987) (quoting *Shawnee State Bank v. North Olathe Industrial Park, Inc.,* 228 Kan. 231, 236–37, 613 P.2d 1342 (1980)). An "[a]pparent agency is based on intentional actions or words of the principal toward third parties which reasonably induce or permit third parties to believe that an agency relationship exists." 241 Kan. at 46, 734 P.2d 1071. The indices of apparent authority must come from the principal. *Phillips v. Carson,* 240 Kan. 462, 482, 731 P.2d 820 (1987); *see In re Donald G. Atteberry, DVM, P.A.,* 1994 WL 191802, at *4 (D.Kan.1994) (citing Restatement (Second) of Agency § 27 (1958) (which defines apparent authority as "created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.")). "An agency does not exist merely 'because a third person assumed that it existed, nor because the alleged agent assumed to act as such, nor because the conditions and circumstances were such as to make such an agency seem rational and probable. . . .'" *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 401 (10th Cir.1986) (quoting *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. 366, 548 P.2d 719, 723 (1976) (quoting in turn *Shu-*

*gar v. Antrim,* 177 Kan. 70, 276 P.2d 372, 375 (1954))).

It is the burden of the defendants as the parties relying on the asserted agency relationship to prove its existence by a preponderance of evidence that is clear and satisfactory. *Barbara Oil Co. v. Kansas Gas Supply Corp.* 250 Kan. 438, 448, 827 P.2d 24 (1992); *Highland Lumber Co., Inc. v. Knudson,* 219 Kan. at 366 Syl. ¶ 1, 548 P.2d 719. As part of this burden, the defendants must show their reliance on the agent's apparent authority was reasonable. *See Universal Premium Acceptance Corp. v. Preferred Nat. Ins. Co.,* 157 F.Supp.2d 1222, 1229 (D.Kan.2001). "[W]hat constitutes an agency and whether there is any competent evidence reasonably tending to prove its existence" are questions for the court, but "the weight to be given evidence and the resolution of conflicts therein are" matters reserved for the jury. *Dealers Leasing, Inc. v. Allen* 26 Kan.App.2d 745, 755, 994 P.2d 651(1999) (citations omitted). "Where the existence of agency is disputed, its existence or non-existence is ordinarily a question of fact for the jury, to be determined upon proper instructions." *Barbara Oil Co. v. Kansas Gas Supply Corp.* 250 Kan. at 447, 827 P.2d 24.

The court believes there are questions of material fact concerning the defendants' actual reliance on the plaintiff's conduct with regards to Phillip Altendorf's authority and the reasonableness of that asserted reliance. While saying they relied on Phillip Altendorf's title with Dodson International, there is no evidence that they made inquiries into the propriety of Altendorf's actions. The defendants competed with the plaintiff in the aviation salvage business, and the plaintiff conducted a larger volume of such business. For some of the transactions, the defendants had agreed to pay commissions to the Al-

tendorfs from the profits and even paid the Altendorfs a commission in one such transaction. From these circumstances, the defendants were in a position where quite arguably a reasonable person would have inquired into the propriety of the Altendorfs engaging in such transactions and the existence of such authority. *See In re Branding Iron Motel, Inc.,* 798 F.2d at 401. These same circumstances seriously call into the question the reasonableness of the defendants' assumption that Altendorfs had the authority to engage in transactions which would cost their employer profits and from which they would earn personal commissions. *Id.* As these are disputed material questions to be resolved by the finder of fact, the court denies the defendants' motion for summary judgment on this issue.

## TRADE SECRETS

The defendants contend that the plaintiff's claims for misappropriation of trade secrets in violation of K.S.A. 60–3320 must fail because the plaintiff has not specified with particularity the information alleged to be a trade secret, the plaintiff did not take reasonable steps to protect the secrecy of any such secrets, and the plaintiff cannot show that the defendants misappropriated this information.

The plaintiff claims the Altendorfs in working with the defendants to formulate and submit bids on the different aircraft used the plaintiff's "confidential information and methods for calculating and perfecting and obtaining bids or business opportunities for these aircraft." (Dk.116, p. 29). The plaintiff alleges it "owned all rights, title, and interest to receive solicitations and business opportunities presented to it for salvage bids from its customers, clients, owners and insurers" and that customer lists and information are trade secrets. *Id.* The plaintiff further claims its

relationship with certain insurers and owners of aircraft in this case "lent itself to an exclusive relationship in which certain trade secrets were developed" and the defendants misappropriated "Dodson's access to and relationship with clients through the Altendorfs." *Id.* at 30.

The threshold issue here is whether the plaintiff has come forth with admissible probative evidence from which a jury reasonably could find that the information allegedly misappropriated was a trade secret. The existence of a trade secret is a question for the trier of fact. *Fireworks Spectacular v. Premier Pyrotechnics,* 147 F.Supp.2d 1057, 1065 (D.Kan. 2001). The plaintiff has "the burden of producing some evidence that the information ... provided to defendants meets the definition of a trade secret." *MomsWin, LLC v. Lutes,* 2003 WL 21554944, at *6 (D.Kan. Jul.8, 2003) (citing *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 661 (4th Cir.1993); *qad, inc. v. ALN Assocs., Inc.,* 1990 WL 106540, at *2 (N.D.Ill. 1990)). The plaintiff's burden is not met by general allegations:

> Plaintiffs must describe the subject matter of their alleged trade secrets in sufficient detail to establish each element of a trade secret. *See BioCore, Inc. v. Khosrowshahi,* 96 F.Supp.2d 1221, 1229 (D.Kan.2000); *Utah Med. Prods., Inc. v. Clinical Innovations Assocs., Inc.,* 79 F.Supp.2d 1290, 1312–13 (D.Utah 1999); *Pulsecard, Inc. v. Discover Card Servs., Inc.,* 1996 WL 137819, at *3 (D.Kan. Mar.5, 1996); *AMP, Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987) (failure to identify specific trade secrets precludes injunctive relief against threatened disclosure); *Julie Research Lab., Inc. v. Select Photographic Eng'g. Inc.,* 810 F.Supp. 513, 519 (S.D.N.Y. 1992) (plaintiff bears burden of identifying trade secrets in detail); *qad, inc.,*

1990 WL 106540, at *2 (dismissal on account of persistent failure to identify trade secrets). Although plaintiffs are not required to disclose all of their trade secrets, they must do more than merely allege that they had trade secrets. *Trandes,* 996 F.2d at 661; *Utah Med. Prods.,* 79 F.Supp.2d at 1312–13.

*MomsWin, LLC v. Lutes,* 2003 WL 21554944, at *6

The Kansas Uniform Trade Secrets Act, K.S.A. 60–3320(4) defines a trade secret as follows:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

In sum, to be a trade secret, the information must have independent economic value, must derive its value from not being generally known or readily ascertainable, and must have its secrecy maintained by reasonable efforts. *Curtis 1000, Inc. v. Pierce,* 905 F.Supp. 898, 901 (D.Kan.1995).

As a general proposition, tangible customer lists and other information about customers may constitute a trade secret. *BioCore, Inc. v. Khosrowshahi,* 96 F.Supp.2d 1221, 1235 (D.Kan.2000). "It is the tangible customer lists and notes, as opposed to the customers themselves, that are the protected trade secrets." *Fireworks Spectacular v. Premier Pyrotechnics,* 147 F.Supp.2d at 1068 (citing *Garst v. Scott,* 114 Kan. 676, 220 P. 277, 278 (1923) and *BioCore, Inc. v. Khosrowshahi,* 96 F.Supp.2d at 1235). Of course, a

mere list of customers' names and addresses may not always be a trade secret, this conclusion is made after a "fact-intensive inquiry" into the contents of the list. *BioCore,* 96 F.Supp.2d at 1235. When the information or lists contain matters readily known or accessible to the public, trade secret status and protection depends on other considerations including the effort made in compiling the information and keeping it confidential:

> Customer lists containing merely public information that could be easily compiled by third parties will not be protected as trade secrets; however, where "the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection." *Robert B. Vance & Assocs., Inc. v. Baronet Corp.,* 487 F.Supp. 790, 799 (N.D.Ga.1979).

*Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,* 86 F.Supp.2d 1102, 1106 (D.Kan.2000). Another consideration is what other detailed information is compiled with the customer lists: "Detailed records, however, regarding such information as purchasing patterns, sales volumes and payment histories may be a trade secret." *BioCore, Inc.,* 96 F.Supp.2d at 1235 (citing *All West Pet Supply Co. v. Hill's Pet Prod. Div.,* 840 F.Supp. 1433, 1438 (D.Kan.1993)). Rather than requiring complete secrecy, Kansas law only requires the trade secret owner to "exercise reasonable efforts under the circumstances to maintain its secrecy." *Fireworks Spectacular v. Premier Pyrotechnics,* 107 F.Supp.2d 1307, 1308 (D.Kan.2000).

" '[E]ven if the plaintiff establishes the existence of a valuable trade secret which has been subject to reasonable efforts to maintain secrecy, the plaintiff still must establish that there has been a misappropriation of the trade secret by the defendant.' " *Airport Systems Intern., Inc. v. Airsys ATM, Inc.,* 2001 WL 1718274, *5 (D.Kan.2001) (quoting *Pulsecard, Inc. v. Discover Card Servs., Inc.,* 1996 WL 137819 *3 (D.Kan.1996) (citations omitted)). The Kansas Trade Secrets Act defines "Misappropriation" in these terms:

> (2) "Misappropriation" means:
>
> (i) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (ii) disclosure or use of a trade secret of another without express or implied consent by a person who
>
> (A) used improper means to acquire knowledge of the trade secret; or
>
> (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
>
> (I) derived from or through a person who had utilized improper means to acquire it;
>
> (II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

K.S.A. 60–3320(2). Under the Act, "improper means" includes conduct such as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." K.S.A. 60–3320(1).

■ From its careful review of the summary judgment facts and evidence, the court concludes that the plaintiff has not come forth with specific facts supported by significant probative evidence from which a rational trier of fact could find for the plaintiff on its trade secret claims. While the plaintiff argues trade secret protection for customer lists, methods for calculating and perfecting and obtaining bids or business opportunities, the plaintiff offers no proof of tangible customer lists or other protected customer information actually misappropriated by the defendants, nor is there any proof that its methodology for calculating, perfecting and obtaining bids has value because it is not generally known or readily ascertainable to others. The plaintiff cites Bob Dodson's testimony on proprietary information in records showing the sales history of different parts and usefulness of this information in formulating bids. While alleging this information was necessarily misappropriated because the Altendorfs' cooperated with the defendants in formulating bids for the different aircraft, the plaintiff offers no evidence or inferences to support these allegations. With regard to the specific transactions alleged in this case, the plaintiff makes no effort to identify the specific information that involves a trade secret and the specific act that constitutes misappropriation. Conclusory allegations and speculation will not sustain a claim that specific proprietary information about prior sales or customer lists was misappropriated. Nor has the plaintiff offered any proof or arguments for according trade secret protection to its opinions concerning reasonable bids. In this regard, the evidence of record indicates the plaintiff readily shared such opinions rather than making efforts to keep them secret.[1] Finally, the plaintiff argues trade secret misappropriation of its access to and relationship with various customers, but it fails to offer any evidence or arguments in support of this argument. The court finds nothing cited in the plaintiff's brief to sustain, factually or legally, the proposition that the plaintiff in being one of several or more dealers regularly bidding on a customer's salvage has a trade secret in simply the relationship with that customer, in the bidding process, or in the opportunity to bid. The court grants the defendants' motion for summary judgment on the plaintiff's trade secret claims.

## UNFAIR COMPETITION

The defendants summarily ask the court to grant their motion on this claim because, as alleged in the pretrial order, this claim involves the same issues as the misappropriation of trade secrets claim. The plaintiff responds that the court should deny the motion for the same reasons argued in opposition to summary judgment on its trade secrets claim. In addition, the plaintiff argues its misappropriation claim does not bar its unfair competition claim and cites *Airport Systems Intern., Inc. v. Airsys ATM, Inc.*, 144 F.Supp.2d 1268, 1270 (D.Kan.2001), for the proposition that an unfair competition claim can be based on a "defendant's improper use of trade secrets *and other confidential business information.*" (Dk. 116, p. 34). The defendants do not raise any preemption issue in their motion, and the pretrial order is silent as to an unfair competition claim based on simply "confidential business in-

---

1. Exhibit 38 of the plaintiff's attached exhibits (Dk.116) includes the deposition of Herbert Michael McKeeman who supervised offices which sold damaged aircraft to different salvage dealers. McKeeman testified that he or his agents regularly called the more reliable bidders, including the plaintiff, and would describe a particular damaged aircraft and obtain the bidders' instant valuation to assist the underwriter in deciding on the best way to dispose of the damaged craft.

formation." The court sustains the defendants' motion on this claim for the same reasons summary judgment was granted on the plaintiff's trade secret claim.

## CIVIL CONSPIRACY–MOTION TO AMEND PRETRIAL ORDER

To address the defendants' motion for summary judgment on the plaintiff's civil conspiracy claim, the court first must determine the parameters of this claim. The plaintiff's factual contentions found in the current pretrial order include the following:

> From about October 1998 through June 30, 2000, the Altendorfs conspired with each other and with Eric Chase, Richard Moorhead, Mansfield Heliflight, Inc., and Resources Unlimited, Inc. to unlawfully use and misappropriate solicitations expressly submitted to plaintiff; to unlawfully and improperly appropriate business opportunities that became known to or available to plaintiff through the Altendorfs without plaintiff's knowledge, consent, or permission; to unlawfully and improperly divert business opportunities that became available to plaintiff to some or all of the other defendants; to unlawfully use plaintiff's trade secrets and confidential information to formulate and facilitate submission of bids on damaged or downed helicopters, which had been specifically been solicited from plaintiff.

(Dk.106, p. 4). The plaintiff's remaining factual contentions address generally and specifically the particular transactions that are the subject of the plaintiff's claims. The plaintiff denominates three theories of recovery in the pretrial order: misappropriation of trade secrets, unfair competition, and conspiracy. Under the issues section, the plaintiff lists the elements for each theory, and the following elements appear for the conspiracy theory: "(a) two or more persons, (b) an object to be accomplished, (c) a meeting of the minds, (d) one or more unlawful overt act [sic], and (e) damages proximately caused." (Dk.106, p. 13). As for the issues of fact under the conspiracy theory, the pretrial order includes only: "Whether defendants agreed with each other to misappropriate plaintiff's trade secrets to [sic] in order to secure a profit for defendants." (Dk.106, p. 14). Finally, under the relief requested section of the pretrial order, the plaintiff asserts:

> Specifically, plaintiff requests that defendants be ordered to account for and relinquish to plaintiff all gains, profits, and advantages derived by defendants through their alleged conspiracy to misappropriate plaintiff's trade secrets and engage in unfair competition practices against plaintiff. The basis for this relief is found at K.S.A. 60–3321(c), which provides that in appropriate circumstances, the court may order affirmative acts to protect trade secrets. Plaintiff contends that, based upon defendants' concealed actions to engage in unfair competition, plaintiff is entitled to a full and accurate accounting by defendants so that plaintiff may take remedial action to protect its trade secrets in future transactions.

(Dk.106, p. 15).

Six days after the filing of the pretrial order, the defendants moved for summary judgment on the civil conspiracy claim arguing in part that "pursuant to the Pretrial Order, Plaintiff limited its claim for conspiracy based on the predicate act of misappropriation of trade secrets; however, Mansfield further argues it could not be liable under any other potential wrongful predicate act in an effort to fully address any potential issues raised herein." (Dk.108, p. 26, n. 4). A week later, the plaintiff filed its motion to amend the pretrial order to include factual issues on civil

conspiracy "which were mistakenly omitted from the pretrial order." (Dk.110). The plaintiff seeks to add this language as the issue of fact for its conspiracy claim:

Whether defendants agreed with each other to misappropriate plaintiff's trade secrets, to engage in unfair competition against plaintiff, to tortiously interfere with plaintiff's prospective economic advantage, to defraud plaintiff, and to unjustly enrich defendants in order to secure profit for defendants.

(Dk. 110, Amended Pretrial Order, p. 13). The plaintiff argues that it discovered this omission after reading the defendants' motion for summary judgment and that its amendment does not add any claim or facts but simply clarifies the issues of fact supporting its claim for civil conspiracy. The plaintiff explains the omission is due to excusable oversight and insists the amendment is neither untimely nor prejudicial to the defendants who have known about these very parameters of the conspiracy claim from the allegations in the plaintiff's complaints and have conducted discovery accordingly.

The defendants oppose the motion to amend arguing the plaintiff had ample opportunity during the drafting process and pretrial conferences to catch these supposed omissions. The defendants point out that the plaintiff never named them as parties to any of the independent claims for tortious interference with prospective economic advantage, fraud or unjust enrichment. The defendants contend prejudice would result from the amendment as the plaintiff has not alleged nor has discovery been conducted as to any allegations of fraud. The defendants say they would be prejudiced by a tortious interference claim, because the discovery focused on the alleged misappropriation of information and not on the specific business relationships or expectations that were reasonably cer-

tain to continue. The defendants further argue that allegations about such relationships or expectations are nowhere found in the pretrial order. Finally, the defendants contend a claim of unjust enrichment is one of equity that does not depend upon a required finding of fault, so it cannot serve as a predicate act of conspiracy.

■■■ "A pretrial order, which measures the dimensions of the lawsuit, both in the trial court and on appeal, may be modified 'only to prevent manifest injustice.'" *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1208 (10th Cir.2002) (quoting Fed. R.Civ.P. 16(e)). The movant seeking to amend the pretrial order bears the significant burden of proving manifest injustice without the amendment. *Id.* "Because the issues and defenses of the lawsuit are defined by the terms of the [pretrial] order, 'total inflexibility is undesirable.'" *Id.*

■■■ The Tenth Circuit directs the consideration of the following factors in deciding whether issues should be added to a pretrial order: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; and (4) bad faith by the party seeking to modify the order." *Palace Exploration Co. v. Petroleum Development Co.*, 316 F.3d 1110, 1117 (10th Cir.2003) (quotation and citations omitted). In applying these factors, the paramount concern must be to assure "the full and fair litigation of claims." *Joseph Mfg. Co., Inc. v. Olympic Fire Corp.*, 986 F.2d 416, 420 (10th Cir.1993). "[T]he timing of the motion in relation to the commencement of trial is an important element in analyzing whether the amendment would cause prejudice or surprise." *Davey*, 301 F.3d at 1210–11.

It is counsels' burden "to assure that the pretrial order accurately reflects their re-

spective positions regarding this court's jurisdiction, facts, legal theories, and other matters included therein." *Hung Duc Bui v. IBP, Inc.*, 201 F.R.D. 509, 512 (D.Kan. 2001), *aff'd*, 34 Fed.Appx. 653, 2002 WL 652364 (10th Cir.2002). Counsel are given ample opportunity prior to the district court's signature to review the final draft of the proposed pretrial order, lodge objections, and correct errors and omissions. This court has observed: "Because the pretrial order 'represents a complete statement of all the contentions of the parties,' *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 817 (10th Cir.1979), this court is justified in relying heavily on it in ruling on summary judgment motions and in trying cases." *Hung Duc Bui*, 201 F.R.D. at 513. " 'A policy of too-easy modification [of pretrial order] not only encourages carelessness in the preparation and approval of the initial order, but unduly discounts it as the governing pattern of the trial.' " *Perry v. Winspur*, 782 F.2d 893, 896 (10th Cir.1986) (*quoting* Honorable A. Sherman Christenson, The Pretrial Order, 29 F.R.D. 362, 371 (1961)).

A pretrial order serves to "narrow the issues and thereby streamline litigation," *Lurch v. United States*, 719 F.2d 333, 339 (10th Cir.1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984), and to " 'insure the economical and efficient trial of every case on its merits without chance or surprise,' " *Davey v. Lockheed Martin Corp.*, 301 F.3d at 1208 (quoting *Hull v. Chevron U.S.A., Inc.*, 812 F.2d 584, 588 (10th Cir.1987)). To fulfill its purposes, the pretrial order must sufficiently define the issues, but a court may construe a pretrial order in some circumstances to include issues not specifically mentioned. *Lurch*, 719 F.2d at 339. "Proper pretrial orders are indeed powerful, but even at their best they should be 'liberally construed to cover any of the legal or factual theories that might be embraced by their language.' " *Trujillo v. Uniroyal Corp.*, 608 F.2d at 818 (quoting *Rodrigues v. Ripley Industries, Inc.*, 507 F.2d 782, 787 (1st Cir.1974)).

██ The court believes the plaintiff's requested amendment does more than clarify the current scope of its conspiracy claim as presently stated in the pretrial order. Certainly, the plaintiff's factual allegations at page four of the pretrial order suggest the plaintiff may have wanted its conspiracy claim to address more than the misappropriation of trade secrets. In alleging the objects of the conspiracy, the plaintiff mentions to misappropriate and use solicitations and business opportunities, to divert business opportunities, and to use trade secrets and confidential information. The factual contentions then follow these allegations with:

> The Altendorfs would receive a solicitation or become aware of business opportunities expressly directed to plaintiff and then, without plaintiff's knowledge of such solicitation or business opportunities, misrepresent to the owner or insurer who solicited the bid or presented the opportunity, that plaintiff was not interested in bidding on the available aircraft or would divert the business opportunity to one or more of the defendants. Thereafter, the Altendorfs would either submit a bid and purchase the aircraft at issue for themselves or on behalf of one or more of the other named defendants in this action.... In the alternative, the Altendorfs would withhold knowledge of the business opportunity from plaintiff and inform the other defendants of the opportunity and assist the defendants in taking advantage of that business opportunity.

(Dk.106, pp. 4–5). Nevertheless, the pretrial order does not insert these contentions under the different claims or breaks

them down into elements or issues, except for the misappropriation of trade secrets contention. Reading the sections on issues and relief in the pretrial order clearly conveys that this case involves only the alleged misappropriation of the trade secrets and the defendants' conspiracy to accomplish the same. The issues of fact section specifically mentions only trade secrets under each theory of recovery. Considering that a central purpose of the pretrial order is to narrow and streamline the issues for summary judgment and trial, the court finds that the pretrial order can only be construed as bringing theories of recovery based solely on the defendants' alleged misappropriation of trade secrets.

The plaintiff's requested amendment is improper as it fails to delineate the different factual issues for its civil conspiracy claim that must be included in a pretrial order. Just naming legal theories as the different overt acts does not set any parameters or dimensions to the conspiracy claim and undermines the important function of a pretrial order in narrowing and streamlining the issues for trial. The plaintiff's amendment does not sufficiently define the issues so as to prevent confusion and surprise at trial. While the plaintiff's factual contentions may suggest the possibility of other objects for a conspiracy claim, the pretrial order offers no details concerning which objects or what overt acts would support the respective legal theories. The plaintiff demonstrated its understanding of the need for specific issues by its drafting of the misappropriation of trade secret claim, and its failure to do so in support of its request for an expanded conspiracy claims leaves too many unanswered questions and serious concerns for the defendants and the court.

The defendants convincingly argue prejudice from this proposed amendment. As far as revealed by the summary judgment record, discovery does not appear to focused on the different elements to a fraud claim or a tortious interference with business claim. The defendants say they are unaware of any specific allegations of misrepresentations by them or of specific business relationships or expectancies which were reasonably certain to continue for the plaintiff. The plaintiff does not cite any alleged misrepresentations or business relationships as appearing in the current pretrial order, proposed amendments to the pretrial order, or other pleading. Without such supporting allegations, the defendants rightly contend they would be seriously prejudiced if left to speculate about the particular misrepresentations, business relationships or expectancies involved in these new theories. As for the unfair competition theory, the defendants again are in the dark as to what this claim would entail, as the pretrial order does not mention any issues under this theory other than those in the misappropriation of trade secrets claim. Finally, the plaintiff does not answer the defendants' persuasive argument that any allegation of unjust enrichment cannot serve as a predicate act to a conspiracy claim in this case. For all these reasons, the court denies the plaintiff's motion to amend the pretrial order as proposed.

## CIVIL CONSPIRACY

The defendants move for summary judgment arguing in part that the plaintiff is unable to prove an unlawful overt act. Noting that the only predicate unlawful act presently alleged in the pretrial order for this claim is the misappropriation of trade secrets, the defendants say their motion should be granted because the summary judgment shows the plaintiff is unable to prove any misappropriation of trade secrets. In addition, the defendants argue they are not liable for any other potential wrongful predicate act because the record

fails to show that they owed any duty to the plaintiff or that they participated in the Altendorfs' breach of any duty owed to the plaintiff. In response, the plaintiff refers back to its arguments on the misappropriation of trade secrets claim. Additionally, the plaintiff points to its complaints and to its motion to amend the complaint in arguing it has "at least three additional and separate causes of action beyond the misappropriation of trade secrets/unfair competition claims that may support" its conspiracy claim.

In the previous section, the court found that the pretrial order does not include these additional causes of action and that the plaintiff's motion to amend was improper. Assuming for the sake of argument that the plaintiff's motion to amend had been granted, the court would have requested additional briefing on those additional causes as the parties had not briefed the arguments or allegations nor submitted evidence on the critical elements to these different causes. It is not the practice of this court to decide summary judgment arguments first raised in a reply brief.

The court grants the defendants' motion on this claim for the same reasons given for granting summary judgment on the plaintiff's misappropriation of trade secrets claim.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk.107) is granted;

IT IS FURTHER ORDERED that the plaintiff's motion to amend the pretrial order (Dk.110) is denied.