**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | |
|---|---|
| WOODSPRING HOTELS LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No.: N17C-09-274 EMD CCLD |
| ) | |
| NATIONAL UNION FIRE INSURANCE ) | |
| CO. OF PITTSBURGH, PA, ) | |
| ) | |
| Defendant. ) | |

Submitted:  January 26, 2018
Decided: May 2, 2018

*Upon Plaintiff WoodSpring Hotels LLC's Motion for Partial Summary Judgment for a Declaratory Judgment on Counts I and III Regarding Defense Costs*
***GRANTED***

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, Kenneth H. Frenchman, Esq., Denise N. Yasinow, Esq., McKool Smith, PC, New York, New York, *Attorneys for Plaintiff WoodSpring Hotels LLC*

Seth Niederman, Esq., Fox Rothschild LLP, Wilmington, Delaware, Joseph Collins, Esq., Fox Rothschild LLP, Chicago, Illinois, *Attorneys for Defendant National Union Fire Insurance Company of Pittsburgh, PA.*

**DAVIS, J.**

## I. INTRODUCTION

Plaintiff WoodSpring Hotels LLC ("WoodSpring") is an extended stay hotel company.

Defendant National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union") sells

insurance policies.  WoodSpring obtained a Directors & Officers Insurance Policy (the "Policy")

from National Union.

Burnadette Ruby previously worked for Extended Stay America, Inc. and ESA Management LLC (collectively "ESA"). Ms. Ruby left ESA and began working for WoodSpring. ESA sued WoodSpring, Ms. Ruby, and Michael Docteroff, alleging that Ms. Ruby and Mr. Docteroff appropriated ESA's electronic information, including a customer database, to WoodSpring (the "ESA Litigation"). WoodSpring demanded that National Union undertake its duty to defend the ESA Litigation under the Policy. National Union refused to cover any costs (defense or indemnification) incurred by WoodSpring in the ESA Litigation, contending that such costs fell the Policy's exceptions to coverage. National Union covered some litigation expenses for Ms. Ruby subject to a reservation of rights. The ESA Litigation settled after a mediation.

WoodSpring filed the instant action, seeking a declaration as to the existence, scope and breach of National Union's purported failure to honor its obligations under the Policy. WoodSpring also seeks damages for National Union's alleged breach of contract regarding defense and indemnification obligations owed to WoodSpring under the Policy.

WoodSpring filed a Motion for Partial Summary Judgment for a Declaratory Judgment on Counts I and III Regarding Defense Costs (the "Motion"). In addition, WoodSpring submitted the Affidavit of Kenneth H. Frenchman ("Frenchman Aff.") in support of the Motion. National Union filed their Opposition to Plaintiff's Motion for Partial Summary Judgment for a Declaratory Judgment on Counts I and III Regarding Defense Costs (the "Opposition"). WoodSpring filed their Reply Brief in Further Support of its Motion for Partial Summary Judgment for a Declaratory Judgment on Counts I and III Regarding Defense Costs (the "Reply").

2

For the reasons set forth below, the Court finds that WoodSpring is entitled to summary judgment on Counts I and III because National Union had a duty to defend Ms. Ruby and WoodSpring in the ESA Litigation. Accordingly, the Court **GRANTS** the Motion.

## II. RELEVANT FACTS

WoodSpring is a limited liability company incorporated in Delaware.[1] WoodSpring's principal place of business is Kansas.[2] WoodSpring operates nearly 250 extended stay hotels across the nation.[3]

National Union is incorporated in Pennsylvania with its principal place of business in New York.[4] Nation Union conducts substantial business in Delaware, including the sale of insurance, the investigation of claims, and the issuance of policies that cover policyholders or activities in Delaware.[5]

### A.    THE POLICY[6]

WoodSpring Hotels Holdings LLC ("Holdings") purchased the Policy through National Union.[7] Holdings is WoodSpring's parent company.[8] Holdings is also incorporated in Delaware.[9] The Policy covered Holdings, and its wholly owned subsidiaries including WoodSpring, during the policy period.[10] The policy period provided coverage from March 15,

---

[1] Compl. ¶ 5.
[2] *Id*.
[3] *Id.*
[4] *Id*. ¶ 6.
[5] *Id.*
[6] The Policy is attached as Exhibit A to the Frenchman Aff.
[7] Compl. ¶ 10.
[8] *Id.*
[9] *Id.* ¶ 8; *see also* Reply at 3, n.4. At the Hearing, WoodSpring noted that the Policy incorrectly lists Holdings as a Kansas Company. Holdings is incorporated in Delaware.
[10] Compl. at 10.

2016 until March 15, 2017.[11]  The D&O coverage is subject to a $10 million limit.[12]  Further, the

policyholder is subject to a $50,000 self-insured retention.[13]

The Policy provides protections, including the defense costs, for directors and officers of

the company.  Defense costs are:

> the reasonable and necessary fees, costs and expenses consented to by the Insurer (including premiums for any appeal bond, attachment bond or similar bond arising out of a covered judgment, but without any obligation to apply for or furnish any such bond), resulting solely from the investigation, adjustment, defense and appeal of a Claim against an Insured, but excluding compensation of any Individual Insured.  Defense Costs shall not include any fees, costs or expenses incurred prior to the time that a Claim is first made against an Insured.[14]

Section 2(b) of the Policy defines a "Claim" as:

> (i)      a written demand for monetary or non-monetary relief . . .
>
> (ii)     a civil, criminal, administrative, regulatory or arbitration proceeding for monetary or non-monetary relief which is commence by:
>
>> (1) service of a complaint or similar pleading;
>>
>> (2) return of an indict, information or similar document (in the case of a criminal proceeding); or
>>
>> (3) receipt or filing of a notice of charges; or
>
> (iii)    a civil, criminal, administrative or regulatory investigation of an individual Insured:
>
>> (1)   once such Individual Insured is identified in writing by such investigating authority as a person against whom a proceeding described in Definition 2(b)(ii) may be commenced; or
>>
>> (2)   in the case of an investigation by the Securities Exchange Commission ("SEC") or a similar state or foreign government authority, after:
>>
>>> (a)  the service of a subpoena upon such Individual Insured; or

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] Policy § 2(k).

(b) the Individual Insured is identified in a written "wells" or other notice from the SEC or a similar state or foreign government authority that describes actual or alleged violations of laws by such Individual Insured.

The term "Claim" shall also include any Securities Claim and any Derivative Demand.[15]

Section 2(t) defines "Insured" under the contract as "(i) an Individual Insured; or (ii) the Company."[16] An "Individual Insured" is an "(i) Executive of a Company; (ii) Employee of a Company; or (iii) Outside Entity Executive."[17]

The Policy defines an "Employee" as "any past, present or future employee, other than an Executive of a Company, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any part-time, volunteer, seasonal and temporary employee. . . ."[18]

The Policy provides the Insured to recover Defense Costs from the Insurer. Specifically, Section 7 states:

> The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them. Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of the Insureds to the Insurer pursuant to the notice provisions . . . This right shall terminate if not exercised within thirty (30) days of the date the Claim is first made against an Insured. Further, from the date the Claim is first made against an Insured to the date when the Insurer accepts the tender of the defense of such claim, the Insureds shall take no action, or fail to take any required action, that prejudices the rights of any Insured or the Insurer with respect to such Claim. Provided that the Insureds have complied with the foregoing, the Insurer shall be obligated to assume the defense of the Claim, even if such Claim is groundless, false or fraudulent. The assumption of the defense of the Claim shall be effective upon written confirmation

---

[15] Policy § 2(b).
[16] Policy § 2(t).
[17] Policy § 2(s).
[18] Policy § 2(m).

sent thereof by the Insurer to the Named Entity. Once the defense has been so tendered, the Insured shall have the right to effectively associate with the Insurer in the defense and the negotiation of any settlement of any Claim, subject to the provisions of this Clause 7; provided, however, the Insurer shall not be obligated to defend such Claim after the Policy Aggregate Limit of Liability or any applicable Separate Limit of Liability . . .

When the Insurer has not assumed the defense of a Claim pursuant to this Clause 7, the Insurer nevertheless shall advance, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim. Such advanced payments by the Insurer shall be repaid to the Insurer by each and every Insured or the Company, severally according to their respective interests, in the event and to the extent that any such Insured or Company shall not be entitled under the terms and conditions of this D&O Coverage Section to payment of such Loss. . . .[19]

The Policy also contains exclusions from coverage.

The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against Insured:

. . .

(g) alleging, arising out of, based upon or attributable to any actual or alleged act or omission of an Individual Insured serving in any capacity, other than as an Executive or Employee of a Company, or as an Outside Entity Executive of an Outside Entity;

. . .

(t) with respect to Coverage B(i) only: (i) for any actual or alleged plagiarism, misappropriation, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights; (ii) for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships; . . . .[20]

Endorsement 10 deletes and makes some changes to Exclusion 4(t). The new Exclusion 4(t)

states:

with respect to Coverage B(i) only:

---

[19] Policy § 7.
[20] *Id.* § 4(g), (t).

(i)     for any actual or alleged plagiarism, misappropriate, infringement or violation of copyright, patent, trademark, trade secret or any other intellectual property rights; *provided, however,* that this exclusion shall not apply to a **Securities Claim**;

(ii)    for any actual or alleged violation of any law, whether statutory, regulatory or common law, respecting any of the following activities: anti-trust, business competition, unfair trade practices or tortious interference in another's business or contractual relationships, provided, however that this exclusion shall not apply to a **Securities Claim**;

(iii)   for any actual or alleged contractual liability of the **Company** or any other **Insured** under any express contract or agreement; *provided, however,* this exclusion shall not apply to liability which would have attached in the absence of such express contract or agreement, or to a **Securities Claim**; or

(iv)    seeking fines or penalties or non-monetary relief against the **Company**, provided, however, that this exclusion shall not apply to a **Securities Claim**.[21]

It appears that the purpose of Endorsement 10 is to make clear that Securities Claims are not excluded from coverage under Exclusion 4(t). The ESA Litigation did not involve Securities Claims.

## B.     THE ESA LITIGATION[22]

On October 31, 2016, ESA initiated the ESA Litigation against WoodSpring, Ms. Ruby, and Mr. Docteroff. Ms. Ruby worked for ESA before she began working for WoodSpring in July of 2015.[23] Ms. Ruby signed a Separation Agreement and Release that included non-compete and confidentiality provision before leaving ESA.[24]

The complaint in the ESA Litigation ("ESA Complaint") is thirty-seven pages long. The Court finds that the ESA Complaint is extensive and appears to be competently and carefully drafted. ESA states that its cause of action "arises out of Defendants' theft and misuse of ESA's

---

[21] Compl., Ex. A at 75-76.
[22] The complaint in the ESA Litigation is attached as Exhibit B to the Frenchman Aff.
[23] Mot. at 6.
[24] *Id*; *see also* Frenchman Aff., Ex. B ¶¶ 29-33.

competitively sensitive trade secret information, concerning tens of thousands of ESA customer accounts" so that WoodSpring could unfairly compete with ESA.[25]

The ESA Complaint asserted, among other things, that "Ruby, with the help of ESA's IT Consultant Docteroff, allegedly obtained and distributed confidential and competitively sensitive ESA electronically stored information, including an 'ESA Sales Spreadsheet,' to WoodSpring's sales team."[26] The ESA Complaint defines "Trade Secrets" as ESA's "database of detailed information concerning its corporate customers."[27] The database is further described as including extensive customer and market-specific information.[28]

The ESA Complaint asserts eleven separate cause of action—Counts I through Count XI. Specifically, the ESA Complaint alleges: (i) violation of the Federal defend trade secrets act (Count I); (ii) violation of the North Carolina trade secrets protection act and Kansas uniform trade secrets act (Count II); (iii) breach of contract — against Ms. Ruby (Count III); (iv) breach of fiduciary duty — against Ms. Ruby (Count IV); (v) violation of the federal computer fraud and abuse act (Count V); (vi) violation of the North Carolina Computer Trespass Statute — against Mr. Docteroff (Count VI); (vii) unfair trade practices (Count VII); (viii) tortious interference with contract — against Ms. Ruby and WoodSpring (Count VIII); (ix) tortious interference with contract — against WoodSpring (Count IX); (x) tortious interference with business expectancy — against Ms. Ruby and WoodSpring (Count X); and (xi) civil conspiracy (Count XI).[29]

---

[25] Frenchman Aff., Ex. B at 1.
[26] Mot. at 6; *see also* Frenchman Aff., Ex. B ¶ 48-62.
[27] Frenchman Aff., Ex. B ¶ 39
[28] *Id.*
[29] Mot. at 7; *see also* Frenchman Aff., Ex. B.

All of the Counts in the ESA Complaint specifically reference the term Trade Secrets except Count V.[30]  Count V is a cause of action based on the Federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a).[31]  In Count V, ESA contends that Mr. Docteroff, in violation of the CFAA, accessed ESA's computers, and copied and communicated ESA's information to third parties without ESA's permission.[32]  ESA also contends that WoodSpring and Ms. Ruby conspired with Mr. Docteroff to violate the CFAA.[33]

WoodSpring notified National Union of the ESA Litigation as a claim under the Policy.[34] WoodSpring requested that National Union advance Defense Costs to WoodSpring and Ms. Ruby under the Policy.[35]  AIG Claims, Inc. ("AIG") denied WoodSpring's claim on behalf of National Union.[36]  National Union, through AIG, decided that all eight counts against WoodSpring were excluded from coverage under Exclusion 4(t)(i) and 4(t)(ii).  Accordingly, National Union refused to advance WoodSpring's defense costs under Exclusion 4(t).[37]  National Union did agree, however, to advance Ms. Ruby's defense costs subject to a reservation of rights.[38]

On March 6, 2017, WoodSpring responded to National Union's denial.[39]  WoodSpring argued that the Policy covered the claims against Ruby and WoodSpring.  Additionally, WoodSpring told National Union that all defense costs should be advanced and then allocation

---

[30] *See, e.g.,* Frenchman Aff., Ex. B ¶¶ 87, 90, 101, 117, 127, 145, 154, 160, 171, 177 and 183.
[31] Frenchman Aff., Ex. B ¶¶ 134-43.
[32] Frenchman Aff., Ex. B ¶ 136.
[33] Frenchman Aff., Ex. B ¶¶ 140-41.
[34] Mot. at 8.
[35] *Id.*
[36] Opp. at 8.
[37] *Id.*
[38] *Id.*
[39] *Id.* at 9; Frenchman Aff'd., Ex. D.

could be determined at a later time.[40] On March 27, 2017, AIG responded to WoodSpring, reiterating that National Union would not change its positions on defense costs.[41]

On April 4, 2017, a mediation was held for the ESA Litigation. In May 2017, WoodSpring and Ms. Ruby settled the ESA litigation (the "Settlement"). Under the terms of the Settlement: (i) WoodSpring would pay ESA $1,160,000; and (ii) Ms. Ruby would pay ESA $40,000 "from her own assets and Ruby shall not seek or accept reimbursement for such payments from any other Party or from any insurance coverage which may be available to her."[42]

## C.    THE CURRENT LITIGATION

On September 27, 2017, WoodSpring filed the Complaint. In the Complaint, WoodSpring seeks: (i) declaratory relief – duty to pay defense costs for claims against Ms. Ruby; (ii) breach of contract – duty to pay defense costs for claims against Ms. Ruby; (iii) declaratory relief – duty to pay defense costs for claims against WoodSpring; (iv) breach of contract – duty to pay defense costs for claims against WoodSpring; (v) declaratory relief – duty to pay indemnity for claims against Ms. Ruby; (vi) breach of contract – duty to pay indemnity for claims against Ms. Ruby; (vii) declaratory relief – duty to pay indemnity for claims against WoodSpring; and (viii) breach of contract – duty to pay indemnity for claims against WoodSpring.

On October 25, 2017, WoodSpring filed the Motion. On December 8, 2017, National Union filed the Opposition. On January 5, 2018, WoodSpring filed the Reply.

On January 26, 2018, the Court held a hearing on the Motion, Response, and Reply (the "Hearing"). At the Hearing, National Union noted that the reservation of rights only related to

---

[40] Mot. at 9; *see also* Frenchman Aff., Ex. D.
[41] Opp. at 9; Frenchman Aff'd., Ex. E.
[42] Opp. at 8-9.

the indemnity claims of Ms. Ruby. Regarding Ms. Ruby's defense costs, National Union contends that it already paid Ms. Ruby's counsel directly. Further, National Union argues that it did not authorize any payments made to WoodSpring's counsel on behalf of Ms. Ruby. Any policy coverage of counsel for WoodSpring's expenses on behalf of Ms. Ruby, therefore, is an indemnification issue rather than duty to defend issue.

### III. PARTIES' CONTENTIONS

#### A.    WOODSPRING

In the Motion, WoodSpring argues that it is entitled to summary judgment on Counts I and III of the Complaint. WoodSpring contends that, under either Kansas or Delaware law, National Union had a duty to defend, claiming that an insurer owes this duty to an insured under an insurance policy if the claims "may potentially be covered" by the policy on the face of the complaint.[43] WoodSpring argues that this duty to defend applies even if the possibility of the insurer having to defend the insured is remote. WoodSpring also claims that the Court should resolve any doubt of coverage in favor of the insured.

WoodSpring argues that the Policy's exclusions did not apply to all claims asserted in the ESA Litigation. WoodSpring contends that, under applicable law, the Policy should be narrowly with respect to coverage exclusions. Exclusions must be clear and unambiguous in the Policy.

As to the duty to defend Ms. Ruby, WoodSpring notes that Ms. Ruby was an employee of WoodSpring at all times relevant to the ESA Complaint. Because Ms. Ruby was a WoodSpring employee, WoodSpring claims that Exclusion 4(g) does not apply to the ESA Litigation. Next, WoodSpring claims that National Union also had a duty to provide a defense for WoodSpring in the ESA Litigation. WoodSpring contends that National Union improperly denied coverage of

---

[43] Mot. at 12.

WoodSpring under exclusions 4(t)(i) and 4(t)(ii). WoodSpring relies upon the fact that at least two claims in the ESA Complaint, Count V and Count XI, can be interpreted as exposing WoodSpring to potential liability that would not expressly excluded under the Policy. An insurer cannot avoid a duty to defend unless every allegation in a complaint falls into an exception under the policy. Here, not every claim fell under Exclusion 4(g), 4(t)(i), and 4(t)(ii). Therefore, National Union is responsible for defense costs under the Policy.

## B.     NATIONAL UNION

National Union argues that Kansas law applies to this case. The named insured is WoodSpring's parent company, which is a Delaware corporation with its principle place of business in Kansas.[44] Further, National Union argues that Kansas courts have not addressed certain issues raised by WoodSpring regarding the duty to advance defense costs and apportionment of defense costs.[45]

National Union contents that it paid for all attorneys' fees and expenses incurred in Ruby's defense above the Policy's $50,000 retention, totaling $87,703.04 incurred by Fleeson Gooing. However, National Union argues that the $2.3 million in defense costs incurred by Weil Gotschall and Foulston Siefkin on behalf of Ms. Ruby is unreasonable.

Regarding WoodSpring's costs, National Union argues that Exclusion 4(t) applies to all claims of the ESA Complaint. If the exclusion applies to all claims, then National Union is not responsible for any duty to defend WoodSpring.

---

[44] National Union incorrectly argues that Holdings is a Kansas corporation based on a mistake in the Policy. At the Hearing, WoodSpring noted that the Policy incorrectly lists Holdings as a Kansas Company. Holdings is incorporated in Delaware.

[45] Opp. at 11.

## V. STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[46] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[47] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[48] The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[49] If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate fact-finder.[50]

## VI. DISCUSSION

### A. APPLICABLE LAW

#### i. Conflict of Law

The first step in a conflict-of-law analysis is to decide whether a conflict truly exists. The Court "must compare the competing jurisdictions to determine whether the laws actually conflict on a relevant point."[51] "In determining whether there is an actual conflict, Delaware state courts

---

[46] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

[47] *Id.*

[48] *See Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[49] *See Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

[50] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).

[51] *Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725, 773 (Del. Ch. 2014).

. . . answer a single and simple inquiry: does application of the competing laws yield the same result?"[52]  If the answer is yes, then "the Court should avoid the choice-of-law analysis altogether."[53]

Further, the laws of competing jurisdictions must actually conflict to require an analysis. When one state's laws failed to address a particular issue, it cannot conflict with the laws of another state.[54]  Where one state fails to address a particular issue, the Court should apply the settled law.[55]

The parties disagree about what law applies to this case.  WoodSpring argues that there is no difference between Kansas and Delaware law.  National Union contends that Kansas law applies.  After review, the Court finds that Delaware and Kansas laws do not conflict for purposes of this Motion.  If the laws do conflict later in litigation, however, the Court will conduct a choice of law analysis under Restatement (Second) of Conflict of Laws Sections 6 and 188.[56]

### ii. Insurance contract construction

Delaware and Kansas law are similar regarding the construction and interpretation of an insurance contract.  Contract interpretation is a determination of law.[57]  A court will give the parties' intentions priority when interpreting a contract.[58]  Further, a court will construe the

---

[52] *Laugell v. Bell Helicopter Textron, Inc.*, 2013 WL 5460164, at *2 (Del. Super. Oct. 1, 2013).
[53] *Vichi*, 85 A.3d at 773.
[54] *See Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at * 4 (Del. Super. Nov. 5, 2010).  *See also Deuley v. DanCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).
[55] *See Mills Ltd. Partn.*, 2010 WL 8250837, at *4 (applying Delaware law to exhaustion issue since Delaware's approach to exhaustion is in the mainstream and Virginia law had not addressed the issue before).
[56] *See also Arch Ins. Co. v. Murdock*, 2018 WL 1129110, at *8-11 (Del. Super. Mar. 1, 2018) (conducting choice of law analysis for a D&O policy protecting a Delaware corporation).
[57] *CNH Am., LLC v. Am. Cas. Co. of Reading, Pennsylvania*, 2014 WL 626030, at *4 (Del. Super. Jan. 6, 2014); *Fid. & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212 (D. Kan. 2002) ("If the relevant facts are undisputed, the court may determine whether they are within the terms of the policy.").
[58] *CNH*, 2014 WL 626030, at *4; *Fid. & Deposit Co.*, 189 F. Supp. 2d 1212 ("An insurance contract must be construed in a way that gives effect to the parties' intent.").

contract "as a whole, giving effect to all provisions therein."[59] Clear and unambiguous language will be given its ordinary and usual meaning.[60] A contract is not ambiguous simply because the parties disagree about the contracts proper construction.[61] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible to two or more different interpretations."[62] The contract must be enforced as made.[63] However, if the insurance contract is ambiguous, the policy terms are construed in favor of the insured.[64] Further, in Delaware and Kansas, an insurer bears the burden of proving that a loss or claim is excluded under the policy.[65]

### iii. Duty to defend

Delaware and Kansas law are substantially similar regarding an insurer's duty to defend an insured. In Delaware, "[i]t is well settled that an insurer's duty to defend is broader than its duty to indemnify."[66] "The duty to defend is determined by comparing the allegations contained in the underlying complaint with the terms of the policy."[67] If there is a possibility that "the underlying complaint, read as a whole, alleges a risk within the coverage of the policy," then the insured owes a duty to defend.[68]

To determine if an insurer has a duty to defend an action against its insured, a court should use the following principles:

---

[59] *CNH*, 2014 WL 626030, at *4; *Fid. & Deposit Co.*, 189 F. Supp. 2d 1212.
[60] *CNH*, 2014 WL 626030, at *4; *Fid. & Deposit Co.*, 189 F. Supp. 2d 1212 ("If the insurance contract is unambiguous, the court may not remake the parties' contract and any unambiguous language is "taken in its plain, ordinary, and popular sense.").
[61] *CNH*, 2014 WL 626030, at *4; *Fid. & Deposit Co.*, 189 F. Supp. 2d 1212.
[62] *Id.*
[63] *Hartford*, 189 F. Supp. 2d at 1212.
[64] *CNH*, 2014 WL 626030, at *4; *Fid. & Deposit Co.*, 189 F. Supp. 2d 1212.
[65] *See Miller v. Westport Ins. Corp.*, 200 P.3d 419, 426 (Kan. 2009); *see also Natl. Union Fire Ins. Co. Pittsburgh, P.A. v. Rhone-Poulenc Basic Chemicals Co.*, 1992 WL 22690 (Del. Super. Jan. 16, 1992), *aff'd sub nom, Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192 (Del. 1992).
[66] *Rhone-Poulenc*, 1992 WL 22690 at *5.
[67] *Id.*
[68] *Id.*

15

(a) where there exists some doubt as to whether the complaint against the insured alleges a risk insured against, that doubt should be resolved in favor of the insured;

(b) any ambiguity in the pleadings should be resolved against the carrier; and

(c) if even one count or theory of plaintiff's complaint lies within the coverage of the policy, the duty to defend arises.[69]

In Delaware, the insurer's duty to defend an insured arises as soon as the allegations of the underlying complaint "show a potential that liability within coverage will be established."[70] An insurer then can be excused from its duty to defend only if it can be determined as a matter of law that there is no possible factual or legal basis upon which the insurer might eventually be obligated to indemnify the insured."[71] Therefore, an insurer must show that the allegations of the underlying complaint are "solely and entirely within specific and unambiguous exclusions from coverage."[72]

In Kansas, "an insurer has a duty to both indemnify and defend the insured."[73] "The assessment of whether the insurer has a duty to defend ultimately rests upon whether there is coverage under the insurance policy."[74] While Delaware law only looks to the allegations of the underlying complaint when determining whether there is a duty to defend, Kansas law allows for a broader inquiry on whether there is a duty to defend. "When making the determination, the insurer must take into account the allegations in the complaint, any facts it has been made aware of and any facts it could have reasonably discovered."[75] "The duty to defend arises whenever

---

[69] *Continental Casualty Co. v. Alexis I. du Pont School Dist.*, 317 A.2d 101, 105 (Del. 1974).

[70] *Rhone-Poulenc*, 1992 WL 22690 at *7.

[71] *Id.*

[72] *Id.* (quoting *Avondale Indus., Inc. v. The Travelers Indem. Co.*, 887 F.2d 1200, 1204 (2d Cir. 1989)).

[73] *Hartford*, 189 F. Supp. 2d at 1225.

[74] *Id.* (citing *Spruill Motors*, 512 P.2d at 406).

[75] *Id.*

there is a 'potential of liability' under the policy."[76]  Under Kansas law, an insurer has a duty to defend whenever there is a possibility of coverage, even if the possibility is remote.[77]

Thus, an insurer may have a duty to defend even when it does not have any obligation to indemnify the insured.[78]  However, an insurer does not have a duty to defend an action that is brought "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if the plaintiff secured a judgment against the insured."[79]

The differences, if any, between Delaware and Kansas law are not relevant to this civil action.  The parties have not provided any evidence that National Union (or AIG) considered any facts other than those set out in the ESA Complaint.  In other words, the record before the Court is that National Union only looked to the allegations of the ESA Complaint when it determined to deny coverage and/or to provide coverage under a reservation of rights.

To determine whether the insurer owes a duty to defend to the insured, the court looks at the policy and all of its exclusions.[80]  The insurer must be justified in concluding that there was no possibility that coverage existed under the policy at the time the insured requested the insurer defend the claims.[81]  The pleadings are "merely a starting point for the duty to defend analysis."[82]  "An insurer must additionally consider actual facts of which it is or should be aware when evaluating its duty to defend."[83]  Further, Kansas law "makes clear that the essential inquiry when determining the existence of a contractual duty to defend involves potential for coverage, not liability."[84]

---

[76] *Hartford*, 189 F. Supp. 2d at 1225 (quoting *MGM, Inc. v. Liberty Mutual Ins. Co.*, 855 P.2d 77, 79 (Kan. 1993).
[77] *Park Univ. Enter. v. Am. Cas. Co.*, 314 F. Supp.2d 1094, 1101 (D. Kan. 2004).
[78] *Id.*
[79] *Hartford*, 189 F. Supp. 2d at 1225 (quoting *Spruill Motors*, 512 P.2d at 406).
[80] *Id.*
[81] *Id.*
[82] *Miller v. Westport Ins. Corp.*, 200 P.3d 419, 424 (Kan. 2009).
[83] *Id.*
[84] *See id* at 425.

17

Kansas has yet to address whether an insurer would have a duty to defend all claims if the duty to defend extends even to one claim.[85]  Delaware requires that the insurer "defend the entire action even if only one count or theory of liability potentially lies within the coverage."[86] Kansas and Delaware take a substantially similar approach to the law regarding an insurer's duty to defend.  Moreover, as noted by the United States District Court for the District of Kansas, most jurisdictions—including Delaware—hold that if the insurer owes a duty to defend the insured on one claim, the insured must defend on all claims asserted in that action, even though some of the claims are outside the policy's coverage.[87]  The logical assumption is that Kansas would follow the majority approach.  As such, the Court finds that there is no conflict and will apply Delaware law regarding apportionment.  National Union, therefore, would have a duty to defend the entire ESA Litigation if Ms. Ruby and/or WoodSpring were entitled to defense on any claim asserted in the ESA Litigation.

## B.   NATIONAL UNION OWED A DUTY TO DEFEND MS. RUBY AND WOODSPRING

The ESA Litigation presents at least one claim, Count V, that could potentially require indemnification under the Policy.   On this factual record, to determine if any of the Policy's exclusions apply to the ESA Litigation, the Court will limit the analysis to the pleading in the ESA Litigation.[88]

---

[85] *See Carpenter, Wier & Myers v. St. Paul Fire and Marine Ins. Co*., 1998 WL 976309, at *12 n. 5 (D. Kan. Oct. 30, 1998) (stating that the "Kansas Supreme Court did not indicate whether the insurer would have a duty to defend the entire action when only some of the claims are at least potentially covered," "most jurisdictions have held that if the insurer owes a duty to defend the insured on one claim, the insured must defend on all claims asserted in that action, even though some of the claims are outside the policy's coverage").

[86] *Steadfast Ins. Co. v. EON Labs Mfg., Inc.*, 1998 WL 961791, at *3 (Del. Super. Sept. 18, 1998); *see also Capano Mgt. Co. v. Transcon. Ins. Co.*, 78 F. Supp. 2d 320, 321, 332 (D. Del. 1999).

[87] *Carpenter, Wier & Myers*, 1998 WL 976309, at *12 n. 5.

[88] *See* Part VI.A.

### i. Exclusion 4(g) for Ms. Ruby's claims

Exclusion 4(g) states that the National Union is not responsible for any Claim made against WoodSpring "alleging, arising out of, based upon or attributable to any actual or allege act or omission of an Individual Insured serving in any capacity, other than as an Executive or Employee of a Company, or as an Outside Entity Executive of an Outside Entity; . . ."

WoodSpring notes that the ESA Complaint's allegations against Ms. Ruby arise at a time when Ms. Ruby was an employee of WoodSpring. The ESA Complaint states that Ms. Ruby was employed by WoodSpring as its Vice President of Sales.[89] It is in this capacity that Ms. Ruby purportedly provided "all members of the WoodSpring sales team a document described as an 'ESA sales spreadsheet.'"[90]

National Union argues that it satisfied Ms. Ruby's claims and that WoodSpring is factually incorrect in the Motion. National Union states that "[i]t is undisputed that National Union agreed to pay Ruby's reasonable Defense Costs subject to a reservation of rights."[91] Fleeson Gooing represented Ms. Ruby during the ESA Litigation. National Union states that it paid Fleeson Gooing two invoices for $19,016.50 and $7,190.00.[92] National Union also states that it reimbursed WoodSpring $11,496.64 for an invoice in the amount of $61,496.54.[93] National Union notes that it took out the $50,000 retention from the reimbursement.[94] National Union suspects that Fleeson Gooing received a double payment. National Union also contends

---

[89] *See, e.g.,* Frenchman Aff., Ex. B ¶ 35.
[90] *Id.* ¶¶ 48 and 128 ("Ruby has willfully and maliciously breached, and continues to breach, her fiduciary obligations by retaining confidential and proprietary information belonging to ESA; distributing such information to WoodSpring and its employees; and using that information, in concert with others, to unfairly and unlawfully compete with and divert business from ESA").
[91] Opp. at 20.
[92] *Id.* at 21.
[93] *Id.*
[94] *Id.*

that WoodSpring has failed to show that spending $2.3 million in defense cost in the ESA Litigation was reasonable.

The Court agrees with WoodSpring that National Union fails to adequately address the issue raised in the Motion. The Motion does not seek judgment on Count II entitled "Second Cause of Action (Breach of Contract—Duty to Pay Defense Costs for Claims Against Ruby)." The Motion seeks summary judgment on Count I entitled "First Cause of Action (Declaratory Relief—Duty to Pay Defense Costs for Claims Against Ruby)." Count II is the cause of action that seeks damages for breach of contract as to Ms. Ruby's defense costs that National Union failed to reimburse. Count I seeks a declaration that National Union owed a duty to defend under the Policy for the claims asserted against Ms. Ruby in the ESA Litigation. Instead of addressing this issue, the Opposition addresses the amounts paid and whether other fees fall within the duty to defend Ms. Ruby. The questions as to whether WoodSpring complied with the Policy's requirements as to obtaining and paying defense counsel, and the reasonableness of defense costs, will be addressed when Count II and Count IV are placed before the Court for decision.

The ESA Complaint's allegations demonstrate that ESA was suing Ms. Ruby as an employee of WoodSpring and with respect to her conduct as WoodSpring's Vice President of Sales. Therefore, Exclusion 4(g) does not apply. Accordingly, National Union cannot deny coverage based on Exclusion 4(g). For this reason, the Court finds that WoodSpring is entitled to summary judgment on Count I because National Union had a duty to defend Ms. Ruby in the ESA Litigation.

### ii. Exclusion 4(t) for WoodSpring's claims

Next, all claims from the ESA Complaint must fall within an exclusion to excuse National Union of its duty to defend WoodSpring under the Policy. National Union relies upon

20

Exclusion 4(t) to contend that it owed no duty to defend WoodSpring in the ESA Litigation.  As

set out in length in Section II.A above, Exclusion 4(t) applies to the misappropriation of a trade

secret.  A trade secret is

> information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.[95]

A list or database of detailed information regarding corporate customers may be a trade

secret.  In *Great American Opportunities, Inc. v. Cherrydale Fundraising, LLC*, the Court of

Chancery found that KB's customer list constituted a trade secret.[96]  Although some customer

information was available online, the Court noted that the customer listed also contained

information not contained in any readily available source.[97]  In fact, the customer list contained

the "names of representatives at specific organizations, their contact information, a description of

---

[95] *See Adtile Techs. Inc. v. Perion Network Ltd.*, CV 15-1193-SLR, 2016 WL 3457152, at *3 (D. Del. June 23, 2016) (citing 6 *Del. C.* § 2001(4)).  *But see* TRADE SECRET, Black's Law Dictionary (10th ed. 2014) (also expressing the minority view of trade secret as "Information that (1) is not generally known or ascertainable, (2) provides a competitive advantage, (3) has been developed at the plaintiff's expense and is used continuously in the plaintiff's business, and (4) is the subject of the plaintiff's intent to keep it confidential.").

[96] 2010 WL 338219, at *20 (Del. Ch. Jan. 29, 2010; *see also Dodson Intern. Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1010 (D. Kan. 2004), *modified on reconsideration*, 00-4134SAC, 2005 WL 475363 (D. Kan. Feb. 1, 2005) (finding that customer lists may constitute trade secrets after a "fact-intensive inquiry" into the contents of the list).

> When the information or lists contain matters readily known or accessible to the public, trade secret status and protection depends on other considerations including the effort made in compiling the information and keeping it confidential:
>
>> Customer lists containing merely public information that could be easily compiled by third parties will not be protected as trade secrets; however, where "the party compiling the customer lists, while using public information as a source, ... expends a great deal of time, effort and expense in developing the lists and treats the lists as confidential in its business, the lists may be entitled to trade secret protection.

*Dodson Intern.,* 347 F. Supp. 2d at 1010. *But see Beard Research, Inc. v. Kates*, 8 A.3d 573, 590 n. 103 (Del. Ch. 2010) (While Plaintiffs also claim that CB's customer list is a trade secret, they failed to prove that this list is anything more than a compilation of business cards containing contact information or that such information is not readily ascertainable by proper means. . . . Thus, I find that CB's customer list does not qualify as a trade secret.").

[97] *Great American*, 2010 WL 338219, at *19.

the product type purchased by each group, and past sales amounts."[98] KB also "took steps to protect the confidentiality of its customer lists by, among other things, including provisions in its Employment Contract, its Handbook, and letters it sent its employees following termination that notified sales reps and other KB employees of the sensitive and proprietary nature of that information and prohibited them from disclosing such information while employed with and after leaving KB."[99]

The Court also determined that the customer list contained independent economic value. Although the customers' information unlikely holds independent economic value, plaintiff would likely "lose value and market share if [defendant] could thus enter the market without substantial development expense."[100] The Court found that it would take defendant "a significant amount of time, money, and effort" to compile a similar list.[101]

The Court does find that the term "Trade Secrets" as used in the ESA Complaint constitutes a trade secret under either Delaware or Kansas law.[102] ESA alleges that Trade Secrets in the ESA Litigation are: (i) customer lists and contact information; (ii) the identities of prospective customers; and (iii) pricing and other detailed information associated with ESA's customers.[103] Moreover, the ESA Complaint pleads facts that demonstrate that ESA took steps to protect the Trade Secrets.[104] Unless some claim in the ESA Litigation does not relate to a misappropriation of a trade secret, then National Union would not owe a duty to defend or indemnify WoodSpring in connection with the ESA Litigation.

---

[98] *Id.*
[99] *Id.* at *20.
[100] *Id.*
[101] *Id.*
[102] *See, e.g., Altendorf*, 347 F. Supp. 2d at 1010 (D. Kan. 2004), *modified on reconsideration*, 00-4134SAC, 2005 WL 475363 (D. Kan. Feb. 1, 2005) (finding that customer lists may constitute trade secrets after a "fact-intensive inquiry" into the contents of the list).
[103] Frenchman Aff., Ex. B ¶ 39.
[104] Frenchman Aff., Ex. B ¶¶ 63-75.

WoodSpring argues that National Union may not deny coverage because all claims in the ESA Litigation do not fall within an exclusion. In the ESA Complaint, Count V "alleged that WoodSpring 'conspired with Docteroff to violate the [Computer Fraud and Abuse Act]' and, further, that 'WoodSpring is liable for Ruby's conspiracy to violate the CFAA."[105] The CFAA prohibits "fraud and related activity in connection with computers."[106] Further Count XI of the ESA Complaint alleged civil conspiracy against WoodSpring in that WoodSpring conspired with Mr. Docteroff to use Mr. Docteroff's knowledge of ESA's computer system.[107] WoodSpring specifically argues that Count V and Count IX of the ESA Complaint do not fall under Exclusion 4(t).

Count XI, conspiracy to violate the CFAA, likely will follow Count V. If Count V is a covered claim, so is Count XI. If Count V is not a covered claim, then Count XI is not a covered claim. Therefore, the Court will focus on whether Count V falls under an exclusion in the Policy.

Count V is based on the CFAA. Section 1030(a)(4) of the CFAA states:

> Whoever . . . (4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains *anything of value*, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period; . . . shall be punished as provided in subsection (c) of this section.[108]

Section 1030(a)(4) does not require that item of value be a trade secret or even confidential. From the plain language of Section 1030(a)(4), the focus of a claim under this section is upon the

---

[105] Mot. at 16.
[106] *See* 18 U.S.C. § 1030(a).
[107] *See* Mot. at 17.
[108] 18 U.S.C.A. § 1030(a)(4)(emphasis added).

unauthorized or unlawful access of someone's computer and whether the person accessing the computer obtains anything of value.

ESA, utilizing the Federal Rules of Civil Procedure's notice pleading requirements, sets out a Section 1030(a)(4) claim against WoodSpring and Ms. Ruby in Count V of the ESA Complaint. Moreover, Count V does not rise or fall on whether a trade secret is involved. Instead, ESA must demonstrate that: (i) Mr. Docteroff knowingly and with intent to defraud, accessed a protected ESA computer; (ii) Mr. Docteroff accessed the ESA computer without authorization, or exceeded authorized access; and (iii) by means of such conduct furthered the intended fraud (here copying and communicating "ESA information to third parties") and obtained something of value. While it is plausible that the "ESA information" obtained was a Trade Secret, it is just as plausible that discovery in the ESA Litigation would uncover information other than Trade Secrets that were obtained in violation of Section 1030(a)(4).

As discussed above, Delaware and Kansas law provides that an insurer owes a duty to defend whenever there is a "potential of liability" under the policy. In Kansas, an insurer is also obligated to undertake a good faith analysis of all information known to it or reasonably ascertainable by inquiry and investigation.[109] This is true even when the possibility of coverage is remote, or that ultimately the insurer may have no obligation to indemnify.

The Court is aware that the gravamen of the ESA Litigation is misappropriation of ESA's Trade Secrets. However, ESA's claim under Count V is broader than a misappropriation of a trade secret. Count V relates to unlawful access of ESA's protected computer system with the damage related to copying and communicating ESA information. National Union could have undertaken an investigation to determine exactly what information that entailed but, with the

---

[109] *See Am. Motorists Ins. Co. v. Gen. Host Corp.*, 946 F.2d 1489, 1490 (10th Cir. 1991).

record before the Court, it appears that neither AIG or National Union did that. As such, the Court finds that there was a potential of liability, even if remote, under the Policy.

National Union relies on *Lemko Corporation v. Federal Insurance Company* for the proposition that claims that would independently be covered may fall into an exclusion as part of the contract as a whole.[110] In *Lemko*, the Court held that "[a]ny claims brought under a nominally non-IP legal theory are covered by the exclusion if the claim would not have arisen but for the IP claims.[111] The Court further noted that if a purportedly independent claim is in fact directly contingent on the excluded claim, then the independent claims may fall within an exclusion.[112]

WoodSpring relies on *Hartford Fire Insurance Company v. Vita Craft Corporation* to show that independent claims fall out of exclusions even when they relate to other excluded claims.[113] In *Vita Craft*, the underlying complaint involved invalid patent, breach of contract, patent infringement, misappropriation of trade secrets, and unfair competition.[114] The Court found that the complaint contained allegations that the insured spread false rumors against the plaintiff of the underlying complaint.[115] Spreading rumors is not related to intellectual property rights and the Court found that this claim potentially created a duty defend.[116]

This case is similar to *Vita Craft*. In *Vita Craft*, the insurance policy excluded coverage for injury arising out of trade secrets and intellectual property. The parties only disputed whether one claim—common law unfair competition—fell within coverage. Similarly, the only contested claim in this case is Count V because Count XI follows and flows from Count V. The *Vita Craft* Court found that spreading false rumors, which was the underlying basis for the unfair

---

[110] 70 F. Supp. 3d 905 916-920 (N.D. Ill 2014).
[111] *Id.* at 919.
[112] *Id.*
[113] 911 F. Supp. 2d 1164 (D. Kan. 2012).
[114] *Id.* at 1170.
[115] *Id.* at 1177.
[116] *Id.* at 1179-80.

competition claim, did not relate to the intellectual property rights underlying the remaining claims. As pled by ESA, Count V is broader than the rest of the claims. Count V depends on unlawful access to ESA's computers and obtaining anything of value—*i.e.*, Mr. Docteroff may have violated the CFAA by using a computer to take anything of value—not just trade secrets.

Although *Lemko* involved a similar insurance policy exclusion, the case is distinguishable. In *Lemko*, the Court found that the "purportedly independent claims (usurpation, tortious interference, civil conspiracy, and CFAA)" were directly contingent on the misappropriation of Motorola's technology. In fact, the complaint explicitly alleged that the information involved proprietary trade secrets and confidential information and that the information misappropriated "are statutory 'trade secrets'. . . ."[117]

Here, the ESA Complaint does not explicitly refer to any trade secrets in Count V. In fact, the ESA Complaint states that the purported violation of the CFAA directly relates to unlawfully obtaining ESA information by accessing ESA's computers without authorization. Unlike the ESA Complaint's other counts, Count V does not even specifically use the term trade secrets or Trade Secrets. Count V, therefore, could arise in relation to a covered claim and thus may not be excluded from coverage by Exclusion 4(t).

For these reasons, the Court finds that National Union should have satisfied its duty to defend WoodSpring under the Policy. Accordingly, summary judgment is appropriate as to Count III of the Complaint.

---

[117] *Lemko*, 70 F. Supp. 3d at 920.

26

## VII. CONCLUSION

In summary, the Court finds that WoodSpring is entitled to summary judgment on Counts I and III because National Union had a duty to defend Ms. Ruby and WoodSpring in the ESA Litigation. The Court, therefore, **GRANTS** the Motion.

**IT IS SO ORDERED.**


*/s/ Eric M. Davis*
Eric M. Davis, Judge